EDWIN G. ADAMS, PLAINTIFF IN ERROR, *v.* SAMUEL NORRIS.

In California, where a will with its codicils was offered in evidence, the testator of which died in 1848, an objection to its admission because it had never been admitted to probate was not well founded. The codicil was not inadmissible as testimony on that account.

Neither was it inadmissible because the witnesses who were present at its execution had never been examined to establish it as an authentic act.

An objection to the admission of the codicil, because it does not appear on the face of the instrument that the witnesses were present during the whole time

of the execution of the will, and heard and understood the dispositions it contained, was not well founded.

Cases cited to establish this point.

It was proper in the court to allow evidence to go to the jury of a custom in California as to the manner of making wills, and to instruct them that the evidence was competent; and that if the custom was so prevailing and notorious that the tacit assent to it of the authorities may be presumed, it will operate to repeal the prior law.

The Spanish law upon this point examined, and also the decisions of the State courts in California.

It was proper in the court to instruct the jury that the testator and witnesses should alike hear and understand the testament, and that, under these conditions, its publication as the will of the testator should be made.

With regard to the proof of the will, as all the witnesses were dead, evidence of their signatures and that of the testator was admissible, and also of a declaration by him that he had made a will with a similar devise. The sindico, who attested it, should be counted among the witnesses.

The binding force and legal operation of the codicil are to be determined by the law as it existed when the codicil was made. But the mode in which it should be submitted to the court and jury, and the effect to be given to the testimony that accompanied it, depend upon the law of the forum at the time of trial. It was a proper question to be submitted to the jury, whether, under the circumstances of the case, it was probable the formalities required by law were complied with.

THIS case was brought up by writ of error from the Circuit Court of the United States for the districts of California.

It was an ejectment brought by Adams and Grimes, citizens of Massachusetts, against De Cook and Norris, to recover a rancho in California. The amended complaint reduced the parties to Adams, plaintiff, against Norris, defendant.

Adams claimed, as representing the heirs at law of one Eliab Grimes, and Norris under a codicil to the will of Grimes. The question therefore was, whether the will should stand.

Grimes, who was a Mexican citizen by naturalization, made a codicil to his will in 1845, by which he devised the rancho to his nephew, Hiram Grimes, under whom Norris claimed. The codicil was signed by himself and executed " before me, in the absence of the two alcaldes.

                    " ROBERTO T. RIDLEY, *Sindico.*
    " Witnesses : NATHAN SPEAR.
                GUILLERMO HINCKLEY."

Upon the trial, the plaintiff made out his title, when the defendant offered the original will and codicil in evidence, the will never having been probated.

The witnesses were all dead. Hinckley died in 1846, Spear in the fall of 1849, and Ridley in April, 1852. Grimes, the testator, died in November, 1848.

The first exception was as follows:

The plaintiff admitted the genuineness of the signatures to the documents A and B, and they were given in evidence without objection; but the plaintiff objected to the admissibility of document C, upon the following grounds:

First. Because a paper offered in evidence as a will or codicil without probate, and which has never been duly probated, cannot be admitted in evidence for want of such probate, and does not become a will until probated.

Second. Because the courts of the United States have no probate jurisdiction; and no document or paper purporting to be a will can be probated in any court of the United States.

The court overruled the said objections, and admitted the said document to be given in evidence, and permitted the defendant to offer proof of the execution of said document, the the same not having been admitted to probate by any probate or other court.

The complainant then and there immediately excepted to the ruling of the court, and the exception was then and there allowed.

It would be tedious to follow the trial through the numerous points made, prayers to the court, and rulings thereon; and unnecessary, because the substance of them is stated in the opinion of the court. The jury found for the defendant, and the plaintiff brought the case up to this court.

It was argued by *Mr. Benjamin* and *Mr. Cushing* for the plaintiff in error, and by *Mr. Johnson* and *Mr. Stanton* for the defendant.

The California cases referred to in argument were the following:

Panaud *v.* Jones, 1 California Reports, 497.
Castro *v.* Castro, 6 California Reports, 158.
Grimes's Estate *v.* Norris, 6 California Reports, 621.
Tevis *v.* Pitcher, 10 California Reports, 465.
1 McAllister's Reports, (this case,) 253.

The arguments of the counsel upon both sides, investigating minutely the provisions of the Hispano-Mexican law in force in Mexican California, and referring to the authorities upon that branch of jurisprudence, would not be interesting to the generality of the readers of this volume, and are therefore omitted.

Mr. Justice CAMPBELL delivered the opinion of the court.

The plaintiff claimed, as the assignee of heirs at law of Eliab Grimes, deceased, the title and possession of an undivided seven-eighths of a parcel of land in Sacramento county, known as the rancho del Paso, containing ten square leagues, being the land granted to Eliab Grimes by Micheltorena, Governor of California, the 20th December, 1844. The defendant resisted the claim, as the assignee of Hiram Grimes, who is a devisee of the land by a codicil to the last will of Eliab Grimes, which is in the Spanish language, and of which the following is a translation:

" SEAL FIRST—EIGHT DOLLARS.

"Provisionally empowered by the maritime custom-house of the port of Monterey, in the Department of the Californias, for years eighteen hundred and forty-four and eighteen hundred and forty-five.        PABLO DE LA GUERRA.

" MICHELTORENA.

[SEAL.]

"I, Eliab Grimes, a Mexican citizen by naturalization, having to add a codicil to my testament heretofore made, and desirous of doing it in conformity with law established in this Republic, do make and declare it to be of my will and intention, in presence of the alcalde of this jurisdiction, his secretary, and two witnesses of assistance, as follows:

"Codicil 2d. I give and bestow to Hiram Grimes, my nephew, all the right and title which the Government con-

*Adams v. Norris.*

ceded to me to the rancho known (or named) as the 'rancho del Paso,' in Upper California, situated on the American river, as is delineated and appears in the plan and title, the original of which exists in the public archives of Monterey, together with all the cattle, horses, and other animals, that are on said rancho, as also all the buildings and laboring and cooking utensils, and all other property of mine which is met with on said rancho, deducting always a certain proportion of all the cattle, horses, and other animals, and of their produce, for those who have had the care of said rancho, in payment of their services, according to the agreement made.

"And in order that it may be evident, I sign in the manner above expressed this 18th day of April, 1845, at the pueblo of San Francisco de Asis, and at the same time there remains deposited a copy in the archives of the same.

"ELIAB GRIMES.

"Before me, in the absence of the two alcaldes.

"ROBERTO T. RIDLEY, *Sindico.*

"Witnesses:

"NATHAN SPEAR.
"GUILLERMO HINCKLEY."

The verdict and judgment in the Circuit Court were in favor of the defendant; and the cause is presented to this court upon exceptions to decisions of the presiding judge in the course of the trial.

The defendant, to sustain the codicil, established, by the admission of the plaintiff, the genuineness of the signatures of the testator and of the witnesses to the codicil, and that they were all dead, the testator having died in 1848. He also adduced the testimony of a number of witnesses to prove the existence of a custom in California as to the mode of making wills prior to any change in the Mexican law by the State Government, and that Grimes, shortly before his death, had informed a witness that he had devised his place of del Paso, with the stock on it, to Hiram Grimes, his nephew, and desired of him some aid for his nephew in the settlement of his affairs. No other testimony is reported in the bill of exceptions. It was contended, on behalf of the plaintiff, that the

codicil was not competent as evidence, nor sufficient to transfer property:

1. That the codicil had never been admitted to probate in California, and that the proof of the signatures to the codicil was not sufficient to establish its validity.

2. That there is no statement in the paper itself tending to show that the disposition was dictated by the testator in presence of the witnesses, or read over to the witnesses in the presence and hearing of the testator, they being present at one and the same time, without interruption or turning aside to any other act, and having been so dictated, or so ' read over, was declared by the testator to the witnesses to be his last will and testament.

3. That three witnesses of assistance are necessary to the validity of a will, and that the sindico, not having professed to act as a witness. and being without authority to receive wills in that capacity, the codicil is void for want of the sufficient number of witnesses, and that this deficiency could not be cured by proof of any custom at variance with the written law.

The court did not support these objections, but instructed the jury that a will, executed under the Mexican laws, in presence of only two witnesses, affords no sufficient proof of the execution. But if they should be satisfied, from the proofs in this case, that a uniform and notorious custom existed uninterruptedly for the space of ten years in California, which authorized the execution of wills in the presence of two witnesses only, and which custom was so prevailing and notorious that the tacit assent to it of the authorities may be presumed, then the proof of such a custom, and for such a length of time, will operate a repeal of the prior law, and that two witnesses will be sufficient. On the contrary, if a custom of the character described and for the period mentioned was not proved to their satisfaction in such case, if three witnesses have not attested to the codicil, it is a nullity.

The court further instructed the jury, that if, from the evidence and under the instructions given, they should find three witnesses required, they will inquire whether each and all of

the three witnesses to the will is or are competent; that the will being written in the Spanish language, if either of the witnesses did not speak or read that language, and could not understand the disposition of the property made by it, and that the testator was in the same predicament, such witness would be incompetent, and, unless the custom was established, the codicil would be null; but if the custom was established, that custom would control the case; and if the signatures of the testator and of a sufficient number of witnesses is established, in the absence of countervailing testimony, the jury may infer a due execution of the will. This selection from some twenty exceptions will sufficiently present the questions that were considered in the Circuit Court and have been discussed at the bar of this court.

These instructions require an examination of the law of California, previously to its organization as a State, relative to the execution of a testament, and the modification of that law by the revolution made in its legal system after that event. The law of Spain was introduced into Mexico, and forms the basis of its jurisprudence. By the laws of the Council of the Indies, it was provided in all cases, transactions, and suits, which are not decided nor provided by the laws contained in that compilation, nor by the regulations, provisions, or ordinances, enacted and unrepealed concerning the Indies, and by those which may be promulgated by royal orders, the laws of the kingdom of Castile shall be observed conformably to the law of Toro, with respect as well to the substance, determination and decision of causes, transactions, suits, as to the form of proceeding. The Partidas (6 part, tit. 1, l. 1, 2) describes two kinds of wills. "The one is that which is called, in Latin, testamentum nuncupativum, which means a declaration openly made before seven witnesses, by which the testator makes known by words or in writing who the persons are whom he institutes as his heirs, and the manner in which he disposes of his other property." This form of will is of Roman origin, and can be traced to the modes of testamentary disposition employed in the time of the republic. Originally the form was wholly nuncupative, but the use of writing

was allowable before the testamentum in scriptis was introduced.

The Partidas proceeds to describe the other form of will— "that which is called, in Latin, testamentum in scriptis, which means a declaration made in writing, and in no other way. This will ought to be made before seven witnesses, called at the instance of the testator for that purpose. Each of the witnesses ought to write his name at the end of the will; and if one of them should not know how to write, either of the others may do it for him, at his request. We also say that the testator ought to write his name at the end of the will; and if he should not know, or could not write, then another may do it for him, at his request."

The witnesses were formerly required to superscribe and seal as well as sign the will. If the testator desired to conceal the contents of his will from witnesses, he could do so, either by writing the will, or procuring it to be written, and enclosing it in an envelope, and by writing his name and causing the witnesses to write their names on the envelope, with the declaration that the paper contained the last will and testament of the testator.

The essence of the testamentum in scriptis consists in the writing, and whether it was published to the witnesses who subscribed and attested it, or was concealed from them, was not a fact of any consequence. But the writing contained in the envelope was subject to no formality. It might be written by the testator, or by the hand of another. His signature to the will itself was not required.

The announcement to the witnesses that it was his will, and their attestation of that declaration, and the sufficiency of the seals, were the only securities against forgery or fraud. Other formalities were added, and a rigid exaction of those that were prescribed, rendered this form of testamentary disposition onerous. On the other hand, the nuncupative or oral will was subject to the objections that the witnesses might die, or fail to remember the declarations of the testator, or misrepresent them. In the process of time, the form of making a will orally became unfrequent. The olographic will and the mystic will

served the purpose of those who desired to conceal the disposition of their property; while the written will, prepared by a public officer, and attested by witnesses, was the form commonly used on the continent of Europe.

The last-named form, with a reduced number of witnesses, was permitted in Spain by the law of Toro. This testament might be made before a notary public, but he was not indispensable. If made before a notary public, there should be three witnesses of the vicinage; but if there was not a notary, five witnesses were necessary, unless they could not be had, in which event three witnesses of the place, or seven strangers, would be sufficient. 1 Tapia Febrero, 364.

The authentication of the will by the intervention of judicial authority is also of Roman origin.

Savigny traces the changes in that administration, and explains the manner in which this system penetrated the jurisprudence of Europe; 1 Sav. hist. du droit Ro., 83; and the result, as it affects the question under consideration, is clearly ascertained in the writings of the civilians.

Ricard says: "It results from what has been established, that the depositions of the seven witnesses before the judge, when the nuncupative will has not been drawn up in writing at the time it was made, is in a manner of the essence of the testament, since it could not have effect without those depositions." * * * "But in respect to those that were drawn up in writing," he says, "the opening and reading that were made after the death of the testator contributed nothing to the validity of the testament, and served only to verify the seals of the witnesses, and to render the testament public. We see, however, from laws of the title, in what manner shall testaments be opened (quem ad mod. testam. oper.) in the Code and Digest, that it was the ordinary practice for those who were interested in the execution of the testament to apply to the prætor, who obliged the testamentary witnesses to come before him to admit or deny their signatures and seals, and of which he made a proces verbal; and that this is the practice in the countries where the Roman law prevails."

Ricard des don., 1325—1398.

· The Mexican jurists agree that the written testament from its form is not a public and authentic act, and that it is necessary, to the full enjoyment of their rights, that those interested in the will should invest it with that quality. They show that such a person may compel the production of a will from private custody, and that the witnesses may be examined in reference to all the circumstances relative to the execution of the will, and the capacity and death of the testator; and if it shall result from these that the testament is legal, the judge may order it to be protocoled, and it obtains the faith due to an authentic or public act. These writers describe the measures to be taken in case of the death or absence of the witnesses, in order to obtain the same result. 2 Sala Mex., 127, 128; 2 Curia Felip. Mej., 327; 2 Febrero Mej., ch. 25, section 5.

We do not consider it necessary to inquire whether the elevation of this writing to the grade of an authentic act was a necessary condition to the support of a suit upon it by an heir or legatee in the ordinary tribunals in the Department of California. We think it is clear that the heir was not restrained from entering upon the inheritance, by the fact that this was not done; and that there are circumstances that would have authorized the heir to maintain a suit, even though the testament could not be produced. The right exists independently of that evidence. Merlin, verbo preuve. Gab. des preuves, 368, 450. This testator died in 1848. His devisee seems to have taken possession of the property bequeathed to him. There is no testimony of any action by the tribunals in California previously to the organization of the State Government. We know that the political condition of California from the time of the death of the testator until the organization of that Government was chaotic, and no inference can be drawn from such an omission. Immediately after the organization of that Government, the common law of England was introduced, and the ancient legal system of the Department abrogated. No provision was made for the probate of wills that had been executed before the introduction of that system. "The statute of the State," say the Supreme Court of California, "fails

*Adams v. Norris.*

to require wills executed before its passage to be probated;" and "this was not a casus omissus;" but "the Legislature actually intended to exclude them from the operation of the statute altogether, leaving their validity to rest upon the laws under which they were made."

Grimes v. Norris, 6 Cal. R., 621.

And in Castro v. Castro, 6 Cal. R., 158, they say, that a will is regarded by the courts of England and the United States as a conveyance, and takes effect as a deed, on proof of its execution, unless there be some express statute requiring it to be probated." Conceding, therefore, that, under the Mexican system, the preliminary proof of the will before some public authority was necessary to give it probative force in a court of justice, that condition has been altered by the statutes of California before adverted to.

Our conclusion is, that the codicil was not inadmissible as testimony, because it had never been admitted to probate, and because the witnesses who were present at its execution had never been examined to establish it as an authentic act. The next inquiry will be, whether the codicil is null because it does not appear on the face of the will that the witnesses were present during the whole time of the execution of the will, and heard and understood the dispositions it contained. The laws that prescribe these formalities do not require that express mention shall be made of their observance under the penalty of the nullity of the testament. In Bonne v. Powers, 3 Martin, N. S., 458, the question arose in Louisiana upon a will made in 1799, before the change of government.

The Supreme Court say: "The Spanish law did not require, as our code does, it should appear on the face of the instrument itself that all the formalities necessary to give effect to a will previous to the signature of the testator and the witnesses had been complied with." In Sophie v. Duplessis, 2 Louis. Ann. R., 724, the Supreme Court say: The principle invoked by the defendants, that a will must exhibit upon its face the evidence that all the formalities required for its signature have been fulfilled, has no application to nuncupative testaments under private signatures. Such testaments are not required

to make full proof of themselves, and the observance of formalities which do not appear on the face of the will may be shown by testimony dehors the instrument. Biec, in his supplement to Escriche, reports the case of a mystic will attached for nullity, because the solemnities required for those of that class, in the law of the Partidas before cited, did not appear to have been followed. The supreme tribunal of justice in Spain sustained the will. Sup. al. dic. *v.* Testamento. And the same conclusion is maintained by the French jurists upon similar statutes. Merl. Rep. *v.* Testament.

In order to show that the codicil was valid and translative of property, the defendant introduced evidence of a custom in California as to the manner of making wills, and the jury were instructed that the evidence was competent; and that, if the custom was so prevailing and notorious that the tacit assent to it of the authorities may be presumed, it will operate to repeal the prior law. The civilians state that customs which are opposed to written law are held to be invalid, unless they have been specially confirmed by the supreme power of the State, or have existed immemorially; and it is not material whether they consist in the non-observance of the written law, or in the introduction of principles or practices opposed to such law; that every valid custom presupposes a rule, observed as binding by the persons who are subjected to it, by an unbroken series of similar acts; and that it belongs to the sound, legal discretion and conscience of the tribunals to determine by what testimony such a custom can be established.

Lind's Study of Juris., 14, 17, and note.

The Spanish codes recognise these principles. They say, to establish a custom, the whole or greater part of the people ought to concur in it; that ten years must have elapsed amongst persons present, and twenty at least amongst persons absent, in order to its being introduced; that it may be proved by two sentences of judges or judgments given upon or according to it; that, being general and immemorial, it may repeal or alter the anterior law, the approbation of the Prince being supposed or presumed.

De Asso & Rodri. Inst., ch. 1. 1 Febrero, 55

The custom under consideration is one of a general nature, and its existence for the period must be assumed from the verdict of the jury. It is a rule of property pervading in its application, and necessary to be known in order that judicial administration should be carried on. The recognition of such a rule, if it exists, was therefore to be looked for from the superior and supreme tribunals of the State of California. In the case of Panaud *v.* Jones, 1 California R., 497—505, the Supreme Court say: "The custom with respect to the execution of wills, so far as the testimony goes, appears to have prevailed generally and for a long time in California. It may have been the universal practice from the first settlement of the country." In Castro *v.* Castro, 6 Cal., 158, this observation is cited, and the court say: "That it is shown, from the testimony of various witnesses, that two [witnesses to a will] were sufficient under the customs of California." The same fact is restated in the case of Tevis *v.* Pitcher, 10 Calif. R., 465.

Nor is such a change in the mode of transfer of property a singular fact in the history of the American States. Several cases are mentioned in the opinion of the court in Panaud *v.* Jones, above cited, and a similar instance is mentioned in Fowler *v.* Shearer, 7 Mass., 14.

Nor is the existence of such a departure from the written law extraordinary, when the circumstances of the early history of the Department are understood. The most important of the arrangements for the colonization of the Department related to the establishment of the military districts and presidios, and the mission establishments in close proximity to them. The priests and soldiers were the most conspicuous and influential members of the Department, and exerted supreme influence in its political and economical arrangements. The Spanish laws relieved the soldier from the inconvenient formalities that attended the execution of the ordinary nuncupative or closed testament, and authorized him to make a nuncupative will before two witnesses, or an olographic will.

The canon law distinctly reprobates (*præscriptam consuetudinem improbamus*) the requirement of seven or five witnesses for the testation of a will: "*secundum quod leges humanæ decer-*

*nunt ;*" * * * "*quia vero a divina lege et sanctorum Patrum institutis et a generali ecclesiæ consuetudine id noscitur esse alienum rum scriptum sit, in ore duorum vel trium testium stet omne verbum.*" Decret. Greg., lib. 3, tit. 26, ch. 10.

The precept and example of these dominant classes in the Department may possibly have exercised a controlling influence in forming the habitude of the population on this subject. And if it became prevailing and notorious, so as that the assent of the public authorities may be presumed, upon principles existing in the jurisprudence of Spain and Mexico, the acts of individuals, in accordance to it, are legitimate. This codicil was written in the Spanish language; and it is to be inferred that there was testimony that the testator and one or more of the witnesses understood that language imperfectly.

The instructions of the Circuit Court required the jury to find that the testator dictated the contents of the codicil to the witnesses, they being assembled at the same time, and that it should be then read in the presence of all, so that it was understood by all, and that the testator should then have declared it to be his last will; and the court informed them that if the testator did not understood the language, and there was not present any one who explained and interpreted the codicil in the presence and hearing and understanding of the witnesses, the document was not a valid instrument; and also, if neither the testator nor a sufficient number of the witnesses understood the language of the codicil, that it was not valid.

The Roman law did not require the witnesses to a Latin will to understand the Latin language: "*nam si vel sensu percipiat quis, cui rei adhibitus sit, sufficere.*" It is admitted by the civilians that a testator may dictate his will in his own language, and the will may be drawn in another, provided that the witnesses and notary understand both. The object of the law is that the instrument shall express the intentions of the testator, and it does not require the reproduction of his exact words. Whether the witnesses should understand the language of the will, has been the subject of much contest among those writers; and names of authority may be cited in favor of

either opinion. But the current of judicial authority seems to have decided it is not necessary that the witnesses to a testament should comprehend the language in which it is written. And the same authority has settled that the witnesses should understand the language of the testator.

> 16 Dalloz. jur. gen. tit. disposi. entre vifs. et test., No. 3126.
>
> 3 Trop. don. & test., No. 1526.
>
> 2 Marcad. Exp., 15.
>
> Escriche dicc. verb. interprete.

The instruction of the presiding judge to the jury, that the testator and witnesses should alike hear and understand the testament, and that, under these conditions, its publication as the will of the testator should be made, embraced all that it was necessary to be said upon this part of the case.

The last inquiry to be made refers to the weight to be given to the testimony adduced in support of the factum of the codicil. This consists of the proof of the signatures of the deceased witnesses and of the testator, and of some declaration by him that he had made a will with a similar devise. We comprise, among the witnesses to the will, Ridley, the sindico. It does not appear that a sindico was charged with any function in the preparation or execution of testaments by the law or custom of California. Nor is it clear that the sindico in the present instance expected to give any sanction to the instrument by his official character. He attests the execution of the will, and we cannot perceive why the description of himself which he affixes to his signature should detract from the efficacy of that attestation.

The binding force and legal operation of this codicil are to be determined by the law, as it existed when the codicil was made. But the mode in which it should be submitted to the court and jury, and the effect to be given to the testimony that accompanied it, depend upon the law of the forum at the time of the trial. The evidence of the signatures of the testator and witnesses was competent; and it was a proper question to be submitted to the jury, whether, under the circumstances of the case, it was probable the formalities required by

the law were complied with. As suppletory proof that the testator had made the codicil, and was acquainted with the contents of the instrument, the admission or declaration offered as evidence was competent testimony.

Upon a review of the whole case, our opinion is, there is no error in the record, and the judgment of the Circuit Court is affirmed.