## MANUELA COPPINGER *v.* ARTEMUS W. RICE AND WILLIAM H. FORD.

PROBATE LAWS—TO WHAT ESTATES APPLICABLE.—The estates of persons who died before the passage of the Probate Laws of this State, whether dying testate or intestate, and whether leaving adult or minor heirs, are not within the operation of said laws, but vested in the heirs or devisees under the Mexican law.

MEXICAN LAW OF DESCENTS.—Under the Mexican law, on the death of an intestate, the heirs succeeded immediately to the estate, and became personally responsible for the debts of the deceased; this rule applied equally whether the heirs were adults or minors, but no administration, in the common law sense, was needed or could be had at any time.

ACT OF APRIL 2d, 1866.—The Act passed April 2d, 1866, (Stats. 1866, p. 824,) has no application to the estates of persons dying before the adoption of our probate system.

TAX SALES.—One whose duty it was to pay the taxes upon real property cannot gain an advantage, in respect to the title, by allowing the same to be sold for taxes and buying it in himself or by buying it from a stranger who bought it at the sale. (*Moss* v. *Shearer*, 25 Cal. 45, is cited as authority.)

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The plaintiff had judgment, and the defendants appealed. The other facts necessary to an understanding of the points decided are stated in the opinion of the Court.

*Drake & Hent*, for Appellants.

The defendants pleaded in their answer the curative Act of 1866, (Statutes 1865–6, p. 824,) which reads as follows : " In *all cases* where real estate has been sold in this State, under the order of the Probate Court of the several counties, to purchasers in good faith for a valuable consideration, and defects of form or omissions or errors exist in any of the proceedings, such sales are hereby ratified, confirmed and made valid and sufficient in law to transfer the title of the property sold." This Act is absolutely applicable to, and effectually ratifies, confirms, and makes valid, every sale ever made under the order of any Probate Court in this State to purchasers in good faith for a valuable considera-

tion, whether mere defects of form, or omissions or errors exist in any of the proceedings or not.   The Act declares that *all* sales made under the order of any Probate Court, etc., are made valid, and we insist that the words "*and* defects of form, or omissions or errors exist in any of the proceedings," do not lessen nor in any manner modify the general comprehensiveness of the law; on the contrary, those words add to instead of subtract from its confirmative intent; because it is evident from the statute that not only are *all* void sales made under the *order* of any Probate Court ratified and made valid, but also *all sales* made under the order of such Courts wherein exist any " defects of form, or errors or omissions in any of the proceedings " are cured. An " order " of the Court, " good faith," and a " valuable consideration," whether defects of form or errors or omissions exist in any of the proceedings or not, are the sole elements to be alleged and proved, in order to bring us within the healing purview of the statute.   All these qualifications appear on the face of our answer, and if the statute in question is not unconstitutional the demurrer thereto was improperly sustained.

The weight of authority is in favor of the constitutionality of these curative Acts.   The curative Act of 1866, relates back to the order and conveyance thereunder made by the administrator to O'Callaghan on the 31st January, 1855—that was the date of the conveyance, which has been " ratified, confirmed and made valid and sufficient in law to transfer the title of the property " thus conveyed, and the title *then passed* by relation back of the Act of 1866; and the admitted fact that the title was patented to plaintiff by the Government of the United States on the 19th of July, 1859, will not aid her recovery, as she must be deemed to hold the legal title thus acquired for the vendees of the administrator of her father's estate.   (Brightley's Digest U. S. Laws, 1789–1857, p. 465, Sec. 29; Statutes of California, 1860, p. 28; *Schedda* v. *Sawyer*, 4 McLean, 181; *Emeric* v. *Penniman*, 26

52

Cal. 124; *Wilson et al.* v. *Castro et al.*, 31 Cal. 420.) We also refer the Court, with confidence, to the following authorities, as friendly to the views we have advanced: *Watson* v. *Mercer*, 8 Peters, 88; *Hess* v. *Wertz*, 9 Sergt. & R., 356; *Thornton* v. *McGrath*, 1 Duval, Ky., 354; *Goshen* v. *Stonington*, 4 Conn. 210; *Savings Bank* v. *Allen*, 28 Conn. 97; *Welch* v. *Wadsworth*, 30 Conn. 149; *Taylor* v. *Keeler*, 30 Conn. 824; *Brinton* v. *Severs*, 12 Iowa, 391; *Ralston* v. *Lothian*, 18 Ind. 303; *Commonwealth* v. *Cochituate Bank*, 3 Allen, Mass., 42; *Goshen* v. *Richmond*, 4 Allen, Mass., 458; *Andrews* v. *Worcester, etc.*, 5 Allen, Mass., 65; *Thompson* v. *Morgan*, 6 Minn. 292; *The State, etc.*, v. *Jones*, 21 Maryland, 432; *Hickox* v. *Tallman*, 38 Barb., N. Y., 608; *Moore* v. *Patch*, 12 Cal. 265; *Payne et al.* v. *Treadwell*, 16 Cal. 233; *Wallace* v. *Moody*, 26 Cal. 387; *Dentzel* v. *Waldie*, 30 Cal. 138; *Thompson* v. *Lee County*, 3 Wallace, U. S., 331.

The Court below erred in holding that the tax deed from Ackerson, Tax Collector, to Bassett, did not pass title to the land in controversy. This deed was made in pursuance of the Act of 1857, recited the necessary facts, and is *prima facie* evidence thereof. The only objections made to the deed by respondent is, that it shows upon its face that the land was assessed solely in the name of M. T. O'Conner, and that consequently nothing passed by the conveyance, except the undivided interest (one half) of O'Conner. In other words, respondent takes the position, that a tax deed is a derivative, and not an original, title. In this she is certainly mistaken. Our statute provides that the land itself shall be sold, and not the particular right, title or interest of the person assessed. (*Atkins* v. *Hinman*, 2 Gilman, 449; *Biscoe* v. *Coulter*, 18 Ark. 423; *Collins* v. *Barclay*, 7 Barr, 67; 5 Watts, 288; 2 Watts, 396; 9 Watts, 323; 7 Watts, 490; 1 Watts & Sergt. 166; 2 Sergt. & Rawle, 472; 16 Sergt. & Rawle, 351, 358.)

Appellants further claim that the Court below erred in sustaining the demurrer to what they have denominated their equitable defence. We there allege and show that if plain-

tiff had not had the use of the money which was paid by O'Callaghan, our vendor to her guardian and friend Mr. Greer, that the title to the entire ranch would have totally perished. This particular (and small) tract was sold by her guardian at its then full value, and the proceeds thereof expended by him in presenting and prosecuting plaintiff's claim for confirmation before the Board of the United States Land Commissioners. Here is a sale made under circumstances that addresses itself to the fullest protection of a Court of equity.

*Sidney L. Johnson,* also for Appellants.

The demurrer and the order of the Court below sustaining it, rested upon the case of *Grimes' Estate,* 6 Cal. 621, and those in which it has been followed. A correct result may have been reached in these cases; but we hope to be able to show the Court that the principle on which they were decided was incorrect, and to point out the true rule for their determination.

In all cases of a transition from one system of government and law to another, the policy of the new government is to make the change with the least possible disturbance of private rights. Accordingly, we find that the people of California, in framing their Constitution in 1849, inserted in the schedule the following provisions:

" SECTION 1. All rights, prosecutions, claims and contracts, as well of individuals as of bodies corporate, and all laws in force at the time of the adoption of this Constitution and not inconsistent therewith, until altered or repealed by the Legislature, shall continue as if the same had not been adopted.

" SEC. 2. The Legislature shall provide for the removal of all causes which may be pending when this Constitution goes into effect to Courts created by the same."

Let us see now what were the rights of the heirs of John

Coppinger at this period of transition, and what was the law respecting the succession of the plaintiff to her father's estate.

It is alleged by us that the plaintiff was a minor—even a posthumous child; and moreover that John Coppinger left none but minor heirs. The reason why Manuela claims only half his estate is that he left another child, also a minor, who died in her minority, under the dominion of the Mexican law, and cast her estate upon her mother.

Under the Roman and Spanish law, an estate had to be accepted or rejected by the heir within a given time. If not accepted, it did not devolve upon the heir by law. Heirs of the full age of twenty-five years, who were *sui juris*—that is, not under paternal or marital power—could accept the estate or reject it. If they accepted it, they could do so either with or without benefit of inventory. If they accepted it purely and simply, they made themselves liable for all the debts and legacies, whether the assets sufficed to pay them or not. If they accepted the estate with benefit of inventory, they were liable only to the extent of the assets. Minors under the age of fourteen years could not accept an estate, unless with the authorization of their father or guardian, or of the Judge of their domicil; if over fourteen years of age, and without father or guardian, they might accept an inheritance; but if it proved disadvantageous— that is, if the debts exceeded the assets—such minors had the privilege of being restored to their former position. (Escriche, verb. Aceptacion ó adicion de herencias; Ib., verb. De las personas capaces de aceptar, partid. 6, tit. 6, l. 13; 1 Feb. Novis., lib. 2, tit. 2, cap. 11, De las aceptaciones y repudiaciones de herencias; *Donald* v. *Lobdell*, 2 La. R. 301.)

The plaintiff, a posthumous child scarcely three years of age when the new Courts were created under the Constitution of the State of California, had then neither father nor guardian, and could not act herself. The former Judge of her domicil, through whom the estate of her father might

have been inventoried, administered and secured for her without peril to her, or prejudice to the rights of others, had lost his authority. But there was nothing in the treaty, Constitution, or laws, which changed her right; on the contrary, they in the most express terms guarantee it. This right, under the law which governed and applied it when the right commenced, was defined, guarded, and brought to the period of possession and enjoyment by proceedings and sanctions analogous to those which all civilized nations have found it necessary to invent and adopt in similar cases.

The greater part of a volume of Febrero, (upwards of four hundred pages of volume four of Febrero Novisimo,) the work of Ayora de Partitionibus, in two or three volumes, and many others not known or not accessible here, were filled with the rules, principles, and proceedings applicable to such a case. They were drawn from the Roman law, whence the English law of probate of wills and administration of intestacies was taken. Almost everything we have in our statute or practice came from the same source. The Court by which these rights were to be protected, these proceedings had, by which this minor, then existing and holding such a right was, with safety to herself and security to all possible rights of others, to be brought to the ascertainment and enjoyment of her true and liquidated share of her father's estate, was created by the Constitution under such a designation as comported jurisdiction of this minor's case.

The Legislature afterwards proceeded to frame a statute which was designed to prescribe with the utmost certainty the precise steps by which this right was so to be preserved, eliminated from all claims of others without prejudice to them, and vested finally in this minor. The bar in this and numerous other cases resorted without doubt or hesitation to this tribunal, and the Courts of all degrees, for six years of the active youth of California, applied or recognized this statute as one in which an estate unadministered under the law which existed at its opening, could be authoritatively

administered, liquidated, and devolved upon its rightful successors.

The decision in the case of *Grimes' Estate*, 6 Cal. 621, is appealed to to show that all this was a delusion. But an examination of the facts of that case discloses that Hiram Grimes, who was of full age, had, under the Mexican law, before the adoption of our State Constitution, accepted the estate in question, and become responsible for the debts of his testator, and is not parallel in any sense to the case at bar. It may be admitted that the statute of April 22d, 1850, to regulate the estates of deceased persons, did not require wills executed before its passage to be probated, when by the action of heirs competent to that effect the estate had been transmitted and vested under the former laws; and that the Legislature did not intend, when rights had grown up under that system, to unsettle those rights or open them afresh. The case of Grimes was one of that kind. But it was wholly unnecessary to the determination of that case to hold that the Legislature intended to exclude all such wills from the operation of the statute. It must necessarily have left their validity to rest upon the laws under which they were made, as did the validity of contracts. There was no more reason for refusing to the Probate Court authority to examine the validity of a will made under the Mexican law, than there would be now to deny its authority to inquire into the fact of the validity of a marriage under that law or any other law; a question affecting the distribution of property, which any estate within its acknowledged jurisdiction may present at any time.

The Court assume that the laws of California, under Mexican rule, did not require a will to be probated, and that such a proceeding as the probate of a will was unknown. Wills, we know, might be and perhaps often were made under the Mexican law in authentic form, and proved themselves; others required more or less proof. It is unnecessary for our purposes to go into that question. We have shown that estates might, by the action of the heirs, whether

testamentary or legal, who were *sui juris* and competent so
to act, vest in them at once, without delay, inventory, or
any formalities of administration whatever; and that others,
by the incapacity of the heirs testamentary or legal, could
not vest, but remained in suspense, constituting a class of
estates known to the Roman and Spanish law by the name
of *hæreditas jacens* or *herencia yacente.* The estate of Coppin-
ger was one of these. It fell to two infants, one of whom,
the plaintiff Manuela, was hardly three years old when our
statute of April 22d, 1850, was passed. She came with her
rights to this estate, such as we have represented them,
unchanged under our new laws. She had a right to have
that estate inventoried, administered, and liquidated, so as
to secure her share with safety to herself, and those of
creditors, or any others, if there should be any, whose rights
might be opposed to hers. Our Constitution secured her
rights, and authorized the creation of a Court seemingly for
the very purpose of taking care of such a case as hers.
What, then, is there in the law, as expounded in the case of
Grimes or elsewhere, which should have left that infant
without remedy, and that *hæreditas jacens* with no one
authorized to enter upon it and accept it?

The doctrine of retrospectivity, asserted in the Grimes
case, has been virtually condemned by this Court, in the case
of the *People* v. *Senter*, 28 Cal. 502. We think the principles
of that case sustain our positions in this. We see nothing in
the decisions of the cases of *De la Guerra* v. *Packard*, 17 Cal.
192, and *Soto* v. *Kroder*, 19 Cal. 87, 97, which conflicts with
our views; and the case of *Downer* v. *Smith*, 24 Cal. 114, 123,
relies solely upon the decision in Grimes' case.

*S. F. Reynolds*, for Respondent.

This Court, in *Grimes' Estate* v. *Norris*, 6 Cal. 621, and cases
following that, held that in cases where a party died before
the organization of the State Government, and before the
passage of the Act already mentioned, the Probate Court had

no power or jurisdiction over such estates, and that all their proceedings and their consequences were absolutely null and void, there being a total want of power over such estates. This case has been followed with the cases of *Tevis* v. *Pitcher*, 10 Cal. 477, and *Downer* v. *Smith*, 24 Cal. 123. This last case was decided by the present Supreme Court, and is very clear and pointed upon this question.

The counsel for the appellants says, in his brief, " that he hopes to be able to show that the principle upon which these cases were decided was incorrect, and to point out the true rule for their determination." If it should be admitted that such principle is incorrect, and that this Court may have mistaken the law applicable to such cases, yet I scarcely think that this Court will now, at this late day—being eleven years since the first was decided, the last as late as 1864—overturn the rule there so clearly settled, and open a large number of estates which have been settled, and unsettle the title of a large amount of real estate which has passed through different hands, and been largely improved. The rule has become a rule of property, and to disturb it would produce an incalculable amount of mischief. If there was ever a case in which the doctrine of *stare decisis* should apply, it should here be applied.

The counsel has attempted to make a distinction between the cast of the inheritance upon an infant and on an adult. That distinction is attempted to be placed upon ground that an infant, under the civil law, had no power to accept of the inheritance. There were, under the civil law, two kinds of heirs : the legal, who was the descendant or ascendant in direct line from the intestate; the other who was so made by the will of the testator. The latter might be a stranger, or not a *pariente*. When the stranger, or one who was not entitled by law to the succession, was made an heir by the will, he was obliged affirmatively to accept the estate or inheritance, before it became vested. It was cast upon him by the will, and was in the nature of a contract; and he could accept or reject as he might elect. But the legal heir, upon

whom the inheritance was cast by law as the direct in suc-
cession, had the right to reject the inheritance, if he found it
so far incumbered with the debts of the intestate, as that no
profit would come to him. In that event the creditors then
took it, and under certain judicial proceedings they could
have it disposed of to pay such debts. The legal heir might
also, if he chose, have an inventory, called in the Spanish
law *inventario solemne*, of the inheritance and property of the
intestate, to which he succeeded as heir, and in that event
he would only be liable for the debts of the intestate to the
extent of such property. In order that he might safely pro-
ceed with this choice, the law required the Judge of the dis-
trict to cause such inventory to be made, and then the heir
had some three months thereafter to deliberate what he
would do. If the heir was made such by the will, and other-
wise a stranger, he then, during the time for deliberation,
considered and determined whether he would accept or reject
the inheritance and charge; but if he was the legal heir,
upon whom the law had cast the inheritance, then, during
the same time, he considered and determined whether he
would reject such inheritance. (Escriche, verb. Aceptacion;
verb. Personas capaces de aceptar, Fb. Mijic., lib. 2, cap.
11, sec. 2.)

Justinian, when declaring that the sons and daughters are
the legal and proper heirs, says: " Sed his Prætor permittit
volentibus abstinere hæreditate, ut potius. parentis quam
ipsorum bona similiter a creditoribus possideantur." (Coop-
er's Justinian, lib. 2, tib. 19, sec. 2, de suis hæredibus.) If
the testamentary heir rejects the inheritance, then the legal
heir becomes entitled by his rightful succession. He could
not then be deprived of such succession unless for some good
cause, such as the payment of debts of the testator. When
the inheritance was cast by law upon the legal heir, he could
not be deprived of that inheritance unless he had refused to
accept it, and thereby rejected it. There was no more power
under the civil law, or in the Courts under that law, to

deprive the legal heir of this inheritance, or to sell or dispose of it, than there is now under our law. If he had neglected to make any formal acceptance, or had neglected to make an inventory, and to have accepted such inheritance with the benefit of such inventory, he did not thereby lose his inheritance or his right to it. If he had neglected to do those things, or to pay the debts of the intestate, then the creditors might institute proceedings in the proper Courts or tribunals for such disposition of the property, as was authorized, to pay and satisfy such debts. But that could only be done after the heir at law had had his full time for deliberation, and had failed to reject or had neglected to pay those debts, or to apply the inheritance to such payment. Upon the death of Coppinger, his heir took the estate left by him, by succession, and in fee, and there was no power under the civil law to deprive her of it, except it be to pay debts to which the lands were subject. (Domat's Civil Law, Art. 2,822; Escriche, verb. Heredero Forzosa, I, II, Menor VI; *De la Guerra* v. *Packard*, 17 Cal. 194; *Soto* v. *Kroder*, 19 Cal. 97.) But it is said that, as the plaintiff was an infant, under seven years of age, at the change of government, she had no power to accept or reject, and her case therefore is not within the decisions of this Court. The fee and right of property rested in some one as much under the civil law as at common law. When John Coppinger died the fee was in him. Upon his death it must have passed to some one. I think we have shown that it passed to his heir at law. He died leaving two children, both of whom were infants under seven years of age. If the plaintiff was not vested with the fee of the one half of the inheritance, neither could the other heir have been vested with the other half thereof; for they both must stand alike as heirs of their father. Can there be a doubt but that the mother, who was the ascendant and legal heir of the deceased infant, acquired a perfect title to such one half, and can sell and transmit a good and valid title to such one half to her vendees?

The counsel has likened the condition of the plaintiff to

the *hæreditas jacens* of the Roman law, and the *herencia yacente* of the Spanish law. The legal meaning of *hæreditas jacens* was an estate lying vacant between the demise of the last occupant and the entry of the successor. It was where the property was left without a legal right to any one to enter. It was confined generally to the tenant *per auter vie*, and when the tenant died during the life of the *cestui que vie;* and that in such a case he that could first enter on the land might retain the possession, so long as the *cestui que vie* lived, by occupancy. In such a case, and during the life of the *cestui que vie*, it did not revert to the grantor, for he had parted with all his interest, so long as the *cestui que vie* lived. It did not escheat, for escheats must be of the entire fee. It did not belong to the grantor, for he was dead. It did not descend to heirs, for there were no words of inheritance, it being but a life estate; nor could it vest in the executors, for they could not succeed to a freehold. It therefore was a *hæreditas jacens* inheritance lying vacant and unoccupied. But it did not affect the title to the property, nor the inheritance cast upon the heir. (2 Blackstone, 257.) The Spanish law seemed to confine it to the time between the death of the intestate, who was at the time seized of the estate, and the entry of his heir at law, who succeeded to such inheritance; or where there has not been a partition of the inheritance held in common by two or more such heirs. (Escriche, verb. Herencia yacente.) But it is clear that it did not interfere with the title or the right to the inheritance, or to the full property and right to such inheritance, but merely to the occupation lying vacant for the time being.

I admit that in all cases in which it required the heir to accept or reject the inheritance, that an infant, of himself, could not do either. If it were accepted or rejected by any one on the part of the infant, that on his arriving at lawful age he could, in the one case, be released from the burden, or, in the other case, have the inheritance from him who then might possess it. (2 Domat's Civil Law, Sec. 2,382; Escriche, verb. Inventario, V.)

The counsel seems to place this power of the Probate Court to act in this matter upon the ground that it was necessary to protect the rights and interest of the plaintiff in her inheritance and property. He says that "the former Judge of her domicil, through whom the estate of her father might have been inventoried, administered and secured for her without peril to her or prejudice to the rights of others, had lost his authority." Admit the views of this case taken by the counsel to be correct—what, then, were those rights which were secured to her by the former Judge? · He might have caused an inventory to be made of the infant's inheritance, and, at a certain age, and under certain circumstances, he might have allowed the infant to reject the inheritance, if it were to her advantage. But that Judge had no power to dispose of the inheritance of the legal heir, nor even the minor himself, except to pay debts or to discharge some personal obligation or incumbrance upon the estate; and that only where the curator or the minor, when he was capable to act for himself, had neglected to perform such duty to the prejudice of creditors. If the Probate Court has jurisdiction, as is contended by the counsel, over estates of this character, that Court has no power to sell the inheritance or property of infants for any purpose whatever. They can only sell the property of the deceased when it is necessarily required to pay the debts of such deceased, and then only when it appears that such debts are ascertained to exist, as required by law. Without that statute being strictly complied with, the Probate Court has no jurisdiction or power to sell the real estate of the deceased, and if sold, the purchaser takes nothing by the sale. This is well settled by this Court. I think it satisfactorily appears from the record in this case, that John Coppinger, at the time of his death, owed no debts.

How the rights of the plaintiff, then a helpless infant, were to be protected by this new proceeding in this Probate Court, of which the counsel speaks so feelingly in his brief, by the sale of one half of her large inheritance to pay for

the confirmation of the other half, I am unable, and I think this Court will find it difficult, to understand. She had better have lived under the former Government and its laws, for no such power ever there existed nor would have been tolerated.

By the Court, SANDERSON, J. :

Action to recover an undivided half of a certain parcel of land situated in San Mateo County, being part of the Rancho Cañada de Raymundo, which was granted to John Coppinger, plaintiff's father, in 1840, by Juan B. Alvarado, then Governor of California, and confirmed and patented by the United States to the plaintiff and her mother in 1859.

The case shows that John Coppinger, from whom the plaintiff claims as heir, died intestate in February, 1847, leaving him surviving the plaintiff, Manuela and Maria Juana Antonia, who were his only children and heirs at law, and Maria Louisa, his widow. That the plaintiff was born in May, 1847, subsequent to her father's death. That Maria Juana Antonia died intestate, in February, 1850, at the age of seven years, leaving her mother, Maria Louisa, her heir at law, who subsequently, in September, 1850, intermarried with John Greer. That before the commencement of this action Greer and wife conveyed their interest to one O'Callaghan, who conveyed to one M. T. O'Conner, now deceased, and that the land in question is now in the possession of the defendants as tenants of Maria O'Conner, administratrix of the said M. T. O'Conner.

The answer of the defendants further shows that in December, 1850, the Probate Court of the County of San Francisco, upon the application of John Greer, undertook the settlement and distribution of the estate of John Coppinger, and appointed Greer administrator and also guardian of the plaintiff. That in the due course of administration the premises were regularly sold by Greer to O'Callaghan, and subsequently, on confirmation, conveyed by the former as

administrator to the latter. The answer also shows that the land was sold by Greer as guardian of the plaintiff to O'Callaghan, by leave of said Court, for the purpose of raising means for the support and education of the plaintiff, and of prosecuting her claim to the Rancho Cañada de Raymundo before the tribunals of the United States Government for confirmation and patent. All of these proceedings are set out at length in the defendants' answer, and it is claimed that if the title did not pass by reason of the proceedings of the Probate Court in the matter of the administration, yet by reason of the sale having been also made by her guardian for her benefit and the security and confirmation of her estate, she ought to be decreed to hold the legal title for the benefit of the heirs of M. T. O'Conner and compelled to convey it. It was also claimed at the trial on the part of the defendants that O'Conner had obtained title by virtue of a sale of the premises for taxes levied under the Revenue Acts of 1854 and 1857, while he was in the sole and exclusive possession. One Bassett purchased at the tax sale and in due course of law obtained a deed, and afterwards conveyed to one Stott, who afterwards and after the death of O'Conner, conveyed to his widow and administratrix, Maria O'Conner, lessor of the defendants.

To the matter in relation to the proceedings of the Probate Court and of Greer as guardian, the plaintiff demurred on the ground that they were null and void for the want of jurisdiction in the Probate Court—John Coppinger having died in 1847, before the adoption of the Constitution of California, and the laws in relation to the settlement of the estates of deceased persons. The demurrer was sustained, and the ruling of the Court in that respect is made the principal topic of controversy here.

We agree with counsel for the respondent that it is too late to disturb the rule which was announced in *Grimes* v. *Norris,* 6 Cal. 624. That was the case of a testator who died in 1848, and the question was whether his will had to be probated under the laws of this State, and it was held in

the negative, not by reason of any *casus omissus*, but by reason of the actual intent of the Legislature. This doctrine was approved by the Supreme Court of the United States in *Adams* v. *Norris*, 23 How. 353, and has been uniformly adhered to by this Court from the time of *Grimes* v. *Norris* until the present. (*Tevis* v. *Pitcher*, 10 Cal. 465.) If the statutes of this State have no application to estates of testators who died prior to their passage, by parity of reason the same is true of the estates of such as died intestate, for there seems to have been no reason why any distinction should have been made; but be that as it may, it is clear that the Legislature made none. Hence the cases of *Grimes* v. *Norris* and *Tevis* v. *Pitcher* have ever since been considered as having established the broad proposition that the estates of persons who died prior to the passage of the laws in question, whether testate or intestate, whether leaving adult or minor heirs, were not within the operation of those laws, but the same were regarded as having vested in the devisees or heirs under the Mexican law. Hence it was said in *De la Guerra* v. *Packard*, 17 Cal. 193, "in our view of the rights and liabilities of the heirs under the Mexican system, we do not see upon what principle the estate was subjected to administration under our statute, and we are inclined to the opinion that whatever has been done in this respect must be regarded as unauthorized and illegal." That was the case of an intestate leaving infant heirs. So in *Soto* v. *Kroder*, 19 Cal. 97, it was again said: "Francisco Soto having died in 1845, the heirs took the estate, and are proper parties to suits for the recovery of the premises. The statute, which gives the possession and control of real property belonging to intestates to their administrators until administration of the estate and distribution of the property are had, only applies to cases arising since the statute was passed." So well settled had the rule become, that when the present members of the Court came upon the bench it was considered no longer debatable, and it has been strictly followed since without discussion. (*Downer* v. *Smith*, 24 Cal. 114;

*People* v. *Senter*, 28 Cal. 502; *Wilson* v. *Castro*, 31 Cal. 420.) *Downer* v. *Smith*, as to one of the parties, was a case of infant heirs, but it was never suggested that it could for that reason be distinguished from the cases before it.    These cases must now be regarded as establishing, beyond further controversy, the proposition that on the death of an intestate under the Mexican system, " the heirs succeeded immediately to the estate and became personally responsible for the debts of the deceased," irrespective of the question whether the heirs were adult or minor, and that no administration in the sense of the common law was needed or could be had at any time. It may be that the distinction for which counsel for appellant so learnedly contend should have been made, but it was not, and it is now too late to draw it.    It is impossible to estimate the mischief which might result from a departure from a rule which for so long a time has been regarded by both the bench and the bar as finally settled.

The claim of the appellant, in this connection, that the probate sale, though void at the time it was made, has nevertheless been ratified and confirmed since by the Act of the 2d of April, 1866 (Statutes, p. 824,) is not tenable.    That Act cannot be considered as having any application to estates which were never within the operation of our probate system.    It must be interpreted by the light of that system and the judicial-interpretation which for years had been put upon it.    It must therefore be understood as dealing only with the proceedings of the Probate Courts, so far as those proceedings have reference to estates within the operation of the probate laws as they then and had previously existed, and not with those which related to estates which had vested in the heirs or devisees under a former system, and over which those Courts never had any jurisdiction under the Constitution and laws by which they were created.    Such being our view of the intent and object of the Act, we find it unnecessary, for the purposes of the present case, to inquire whether it is or is not repugnant to the Constitution.

We do not understand the defendants as claiming that the

sale was ordered upon the petition of Greer as guardian, or that he acted in that capacity during any of the proceedings. It is not so expressly alleged, and we understand that reference to Greer's guardianship is made more by way of make-weight than anything else.

So far as the defence rests upon the tax sale, it cannot be sustained. O'Conner was legally bound to pay the taxes. Such being the case, he could not gain any advantage by allowing the land to be sold and buying it in himself, or by buying it from a stranger who bought at the sale. (*Moss* v. *Shear*, 25 Cal. 45.)

Judgment affirmed.