## Case No. 12,595.

### SEAVERNS et al. v. GERKE et al.

[3 Sawy. 353.] [1]

Circuit Court, D. California. June 10, 1875.

ADMINISTRATOR — SALE OF LANDS — GUARDIAN — SALE BY—CONFIRMATION BY STATUTE OF VOID SALE.

1. A sale of lands in the Sacramento district in 1849 made by John Bidwell in the assumed character of administrator, upon authority to settle the estate of a deceased person given by Alcalde Schoolcraft, upon a verbal application, no judicial record of the proceeding having been shown, *held* to be void.

[Cited in McNeil v. First Congregational Soc. (Cal.) 4 Pac. 1098.]

2. Under the act of 1850, authorizing the appointment of guardians for non-resident minors having estates within the state, "after notice given to all persons interested in such manner as the judge shall order," an appointment of guardian without giving any notice whatever is void.

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

3. In such case the record must affirmatively show that every act essential to give jurisdiction to make the appointment has been performed, or the appointment will be void.

4. Where the appointment of a guardian is void by reason of its having been made without first acquiring jurisdiction by giving the notice required by the statute, all subsequent proceedings, including the sale of the ward's estate, are void.

5. The statute of 1866, making valid all sales under orders of the probate court, where there have been "defects of form, or omissions, or errors," does not validate sales made where no jurisdiction to act at all has been acquired. It was only intended to embrace cases where defects, omissions or errors have arisen in the course of the exercise of jurisdiction already acquired.

[Cited in note in Hahn v. Kelly, 34 Cal. 393.]

6. If otherwise, the act itself is void for want of constitutional power in the legislature by a legislative act to arbitrarily transfer the property of one party to another.

Bill in equity to determine an adverse claim and remove a cloud upon the title of complainants to certain lands.

In 1844 the governor of California granted to Edward A. Farwell five leagues of land. In 1845 said Farwell conveyed to James and John Williams the north half of said tract. In or about the month of December, 1845, said Farwell died intestate, seised of such interest in the south half of said tract, being the premises in question, as he acquired under said grant. He left surviving him, residing in some of the Eastern states, a mother, four brothers and one sister, he having at the time neither wife nor children. His said sister, named Lydia Jane Farwell, afterwards in 1851, inter-married with George W. Seaverns. The complainants are the offspring of this marriage, Mary A. Seaverns having been born May 10, 1853, and George H. Seaverns, May 28, 1854. Mrs. Farwell, the mother of said Edward A. Farwell, died intestate in 1852, leaving the said four sons and Lydia Jane, mother of complainants, her heirs at law. On June 14, 1855, said Lydia Jane died intestate, leaving her surviving the said husband George W. and her children, Mary A. and George H. Seaverns, the complainants in this case, who thus inherited from their said mother two fifteenths of all the premises in question, unless the title of the latter was cut off before coming to them by a sale, hereinafter mentioned, made by John Bidwell, October 25, 1849, in the assumed character of administrator of the estate of said Edward A. Farwell. Neither the complainants nor any of said heirs of Edward A. Farwell were ever in the state of California. Prior to and during the year 1849, there was an extensive district of country, including the premises in question, recognized by the people as, and called, the Sacramento district, within which officers, called alcaldes, chief magistrates, and judges of courts of first instance, residing at Sacramento, assumed to act in a judicial character, exercising both civil and criminal jurisdiction. Their acts were generally recognized by the people of the district. At the time of the transfer of California to the United States, Captain John A. Sutter was judge of the court of first instance, in said district, acting under appointment by the Mexican authorities. Subsequent to that time, down to the spring of 1849, these officers were appointed by the United States military commanders in California acting as governors. During the latter part of 1848 and early part of 1849, one Dr. Bates, by virtue of an appointment by Colonel Mason, acted in the capacity of alcalde and judge of the court of first instance until superseded by Henry A. Schoolcraft, who, sometime in the spring, or early part of 1849, was elected alcalde by the people, at a public meeting held at Sutter's Fort. By authority conferred by this election, and, so far as appears, without any appointment by the military commander, or acting governor, or otherwise conferred, he assumed to act as alcalde, judge of the court of first instance, and recorder of conveyances, till about the second of August, 1849, when he was succeeded by Judge Thomas, who acted under an appointment by General Riley, military governor of California, till the establishment of the state government under the present constitution. At the time of his death, Edward A. Farwell was indebted to John Bidwell, and to sundry other parties in various sums. Bidwell, sometime in the summer or fall of 1849, applied to said Schoolcraft for authority to settle up the estate of said Farwell, deceased, and, as Bidwell testifies, authority was given him. But the terms of the authority are not given, otherwise than that, as Bidwell testifies, he followed the directions of Schoolcraft. The date of this application is not very clearly fixed. The most definite testimony on this point is, that the application was made and authority given on the same day upon which Bidwell prepared the notice of sale of the property of the deceased, which notice bears date August 22, 1849. If this is the proper date, it must have been after Schoolcraft ceased to be alcalde, as his successor's records date from August 2, 1849. But it will be assumed that it was while Schoolcraft was still acting. The application for authority to administer on the estate was verbally made in person by Bidwell, no written application or petition being filed, and the authority given by Schoolcraft seems, also, to have been verbal. At all events, there is no evidence sufficient to show that any order in writing, or any record of the transaction was ever made. The application was made, authority given, and the notice of sale of lands prepared, all at the same time, without any kind of notice to the parties interested, or, so far as shown, any record whatever of the proceedings. The notice of sale published, simply states that the estate of Edward A. Farwell, deceased, will be sold at

Sacramento, October 25, 1849, giving a general description of the property, without any reference to any order of court, or authority of any kind, other than the signature, which is, "John Bidwell, Administrator." The notice was published in the Placer Times weekly from August 25 to October 20, and the sale took place October 25 to John Potter for $1,250. The deed to Potter makes no reference to the notice of sale, or authority of Bidwell, other than it purports to be made "between John Bidwell, administrator of the estate of Edward A. Farwell, and John Potter;" and "the party of the first part bargains, sells and conveys to the party of the second part, all the right and title of the said Edward A. Farwell to" the premises described, and it is signed, "John Bidwell, Administrator of Edward A. Farwell." It does not appear that any order confirming the sale was ever asked or made. A paper purporting to be an inventory of Farwell's estate, and an appraisement made ánd sworn to by P. B. Reading and S. J. Hensley, before S. J. Thomas, judge of the Sacramento district, was filed with said Thomas, marked "Filed October 27, 1849," but the filing is not attested by the signature of that officer. Mr. Bidwell, the only witness on the point, is not certain by whom, or how, the appraisers were appointed, or whether appointed at all, and there is no record of their appointment. An auctioneer's account of the sale of Farwell's estate is marked "Filed October 27, 1849," without being attested by the signature of the officer filing it. On May 11, 1850, the claims against the estate of four several persons, viz.: John Bidwell, Thomas Cummings, Samuel J. Hensley and Talbot H. Green, with vouchers showing payment by Bidwell, were filed in the probate court of Sacramento county, established under the state constitution. On the same day, May 11, 1850, there was filed and so marked by the clerk of the said probate court, a document purporting to be the final account of said Bidwell. On May 17, 1850, an order was made and entered by said probate court, Edward J. Willis, county judge and ex officio probate judge, presiding, wherein, after reciting the presentation of Bidwell's account, and that there remained in his hands "a balance of $2,295.20, which account is approved," it was "ordered by the court that the said administrator distribute the said sum among the legal heirs of said deceased equally," without naming them. On the same day a receipt of Tarr & Cone to Bidwell for fifty dollars attorney's fees was filed, and an order was entered by the court allowing said fees. The auctioneer's receipted account was filed November 11, 1850. The foregoing constitute the entire files, and the said two orders entered May 17, 1850, by the probate court, the only orders now to be found, or shown by the evidence ever to have been of record in the administration of said estate. Judge Thomas' record from August 2, 1849, is in

existence, and shows his court to have been opened and business to have been transacted therein on October 25, 26, 27, 29, and 30, 1849—the day of the sale, and days immediately following—but they show no entry of any kind, relating to this proceeding on either of these days, or on any other day during his incumbency of the office from August 2, 1849, until the end of his term of service. No entry is satisfactorily shown to have ever been made by Schoolcraft, or any paper therein ever presented to, or filed by him. There is some evidence, not very satisfactory, tending to show that Schoolcraft kept a small book in which he sometimes entered minutes of judicial proceedings had before him. But there is no evidence to justify the court in finding that any minutes of these proceedings now in question were ever entered, or, if entered, what those entries were.

Section 30 of the act of February 28, 1850, required "the records of the courts of first instance and all books, papers and documents in the custody of such courts, or the clerks thereof, in any way relating to judgments, orders, suits, or any legal proceedings therein" to "be delivered to the county clerk of the county in which is the place of holding the court of first instance immediately after the election and qualification of such clerk." and to be "by him deposited and kept in his office, subject to the order of the district court." St. 1850, p. 80, § 30. Section 33 authorizes the district court thereafter to proceed in "all suits and proceedings" then pending, the same as if proceedings had been commenced in the district court. Section 35 makes similar provisions respecting alcaldes' records in matters where the alcalde acted as judge of the court of first instance; and section 38 similar provisions for transferring other records appropriate to alcaldes' courts to justices of the peace elected under the state organization, who were authorized thereafter to proceed with proceedings then pending. But there is no act authorizing the transfer of anything to probate courts, or authorizing probate courts to proceed and close up any unfinished business of any kind of the alcaldes' courts, or courts of first instance. And section 39 provides for transferring "books of records of deeds, mortgages, powers of attorney and other instruments kept by the alcalde or judge of first instance" to the county clerk. The records of Judge Thomas, Schoolcraft's successor, were transferred under this act. The books and records of Schoolcraft of conveyances, etc., were also transferred as required. And said records so transferred— "the books of records used by Henry A. Schoolcraft for the record of deeds and other instruments in writing, and deposited in the recorder's office in said county (of Sacramento)—were afterwards adopted and recognized as public records by the legislature of California in the act of May 18, 1853. St. 1853, p. 227. But no judicial records were transferred by Schoolcraft as required by the statute before cited, and there is no subsequent legislation adopt-

ing or recognizing any such judicial records. The state government was organized not many months after Schoolcraft was superseded by Thomas, and whatever the nature of the minutes kept by him, if any were kept, it seems highly improbable that they were worthy of being dignified by the name of judicial records; for they must have been in existence at the organization of the state courts, and, if of any importance, in all probability would have been turned over under the provisions of the statute, as were the records of conveyances kept by him, and the judicial records of Thomas.

On February 18, 1853, James Williams, one of said Farwell's grantees to the north half of said Mexican grant of five leagues, by E. O. Crosby, his attorney "on his own behalf, and in behalf of the heirs and legal representatives of Edward A. Farwell, deceased," presented a petition to the board of land commissioners for a confirmation of said grant. He prays that the grant may be confirmed to himself, "and the heirs and legal representatives of said Edward A. Farwell, the names of all of whom will be given in a supplemental petition hereinafter to be filed," etc. On February 13, 1855, by the same attorney, said James Williams, and a number of other parties named, including the heirs at law of said John Potter, filed a supplemental petition, in which, among other things, they set out the death of Farwell; the action of Bidwell as his administrator; the sale of said south half—the premises in question—to John Potter, and the rights of his heirs therein, etc. The heirs of Farwell are not mentioned by name in the petition. On August 28, 1855, the board of land commissioners confirmed "to the heirs at law of Edward A. Farwell, deceased, the south half of the entire grant," and adjudged that the claim of Potter's heirs to the south half "of the grant is not valid, and it is decreed that the same be rejected." On appeal to the district court, the decree of the board was affirmed in the same language, and said decree became final, and the land was patented to the heirs at law of said Farwell in 1863, in accordance with said decree. Whatever interest said John Potter acquired through said sale by John Bidwell by subsequent conveyances, and prior to the filing of the bill had passed to the defendants in this suit. Sometime prior to 1860, Henry R. Mighels, a cousin of Edward A. Farwell, residing at the time in California, and a part of the time in Butte county, had some correspondence with the heirs of Farwell upon the subject of the estate left by Edward A. Farwell. In a letter to his father in 1859, seeking to obtain powers of attorney from some of the heirs, he represents their interest as worth at that time $75,000. He obtained powers from some of them previous to, or early in, 1860, and soon afterward, among other things entered into an agreement with certain attorneys to act for the heirs in recovering their interest, the lands being in the possession of trespassers, and as compensation to

give them one-third of the estate; and another agreement with defendant, Henry Gerke, by which he contracted to convey to him all the remainder of the lands to which the title could be assured and possession recovered, at from two to three dollars per acre, and Gerke was to advance him $2,000 to enable him to go East and obtain proper powers from all the heirs to enable him to carry out his contract. He went East as agreed, and obtained powers from the four brothers, and a power of attorney from George W. Seaverns, father of the complainants; but the power of Seaverns in evidence dated April 7, 1861, duly authorizes Mighels to act as his own attorney to convey such interest as he himself had as heir, without making any reference to his children, the complainants. But if there was any other attempt by the father to authorize the sale of complainants' interest in the land, it was necessarily void. Upon his return, instead of carrying out the first contract, after further consultations and negotiations, he entered into a new contract with Gerke, by which the latter was to pay a gross sum of $6,000 for the interest of the heirs. But Mighels was unable to convey the interest of the complainants, who were still minors under ten years of age, and Gerke's attorneys advised him to institute proceedings in the probate court to divest their rights. Acting upon this advice, and for the purpose of enabling whatever right, title and interest in said lands was vested in complainants to be alienated and divested, said Mighels filed a petition in the probate court of Butte county on March 2, 1861, stating generally the facts of the case, and praying to be appointed guardian with authority to take charge of their said estate. Without any notice whatever, or any other proceeding than the filing of said petition, two days afterwards on March 4, 1861, an order was entered in the minutes of the court as follows: "Now comes H. R. Mighels, and files his petition praying to be appointed guardian of Mary Agnes Seaverns, and George Henry Seaverns, heirs at law of the estate of E. A. Farwell, deceased. Whereupon, it is ordered by the court that said petitioner be appointed guardian of the aforesaid minor heirs of E. A. Farwell, deceased, upon his filing his bond," etc. In due time bond was given, a petition for sale was filed, appraisers appointed who appraised the interest of complainants, being two-fifteenths of several leagues of land situate in Butte and Colusa counties, and one square mile in Sutter county, including claims against trespassers for damages, at $3,500. Such proceedings were had that a sale at auction was afterwards made at which the entire interest, consisting of the said three separate and distinct tracts of land, lying in three different counties, were on December 2, 1861, struck off and sold in gross at one bid to defendant, Gerke, for $100, he being the only bidder; and in pursuance of a subsequent order of the court, the premises were conveyed to Gerke for said sum by said Mighels, and the proceeds remitted to the father of complainants.

J. A. Moultrie, W. H. Laine, and F. E. Spencer, for complainants.

O. C. Pratt, R. R. Provines, W. C. Belcher, and Sharp & Lloyd, for defendants.

SAWYER, Circuit Judge (after stating the facts). Upon the facts stated, the first question presented is, as to the effect of the sale by Bidwell, assuming to act as administrator of the estate of Edward A. Farwell, deceased, under authority claimed to have been derived from Schoolcraft, as alcalde or judge of the court of first instance. It would be going a great way to hold that Schoolcraft could legally exercise any such judicial authority as he is claimed to have exercised in this case, by virtue merely of an election by the people at a public mass meeting held under no existing law, and without any other recognized authority. But, without deciding the question, I shall concede for the purposes of this case, that he was vested with all the authority that alcaldes, appointed by the military governors in the usual way at that time, were authorized to exercise. On this hypothesis, it is claimed by the defendants that the case is within the decision in Ryder v. Cohn, 37 Cal. 69, and governed by it. That case, undoubtedly, goes to the uttermost limit of the legal principle invoked by the court to sustain the sale then under consideration. This decision was by a divided court. It fell to my lot to participate in it, and it was after great hesitation that I yielded my concurrence. Without questioning the correctness of that decision, it would, in my judgment, be necessary to go far beyond it to sustain the sale by Bidwell now in question. In that case the proceedings were of the most formal character, and there was a complete formal record of every step in the proceedings, from the beginning to the end, except that it did not affirmatively appear that any notice of the application was given; but the court held that under the decision in Hahn v. Kelly, 34 Cal. 391, the court being one of general jurisdiction, all presumptions were conclusively in favor of the record, and that its judgments would be upheld on a collateral attack, if tested by the strict rules of the common law. Besides, the record shows that "Edward Norton, Esq., appeared as and was attorney for the absent heirs," who were adults. 37 Cal. 77. In this case there is nothing in the semblance of a record. No application was ever filed; no record of any order or action of the court is produced, and none is shown to have ever existed. The only two orders of which there is any evidence of their having ever existed in writing, are the orders approving the account of Bidwell and allowing an attorney's fee of $50, entered by the probate court on May 17, 1850. The authority of that court was wholly derived from the probate act of the state of California, which, as has long been settled, had no application to the estates of persons who died before the passage of that act. Grimes v. Norris, 6 Cal. 624; Tevis v. Pitcher, 10 Cal. 465; De la

Guerra v. Packard, 17 Cal. 193; Soto v. Kroder, 19 Cal. 97; Downer v. Smith, 24 Cal. 114; People v. Senter, 28 Cal. 502; Wilson v. Castro, 31 Cal. 420; and Coppinger v. Rice, 33 Cal. 408. Besides, as will be seen by referring to the statement of facts, the statute of February 28, 1850, expressly conferred authority to proceed in "all cases and proceedings" pending before alcaldes and courts of the first instance, at the date of the transfers of the records of the state courts, upon the district courts and justices of the peace, and not upon probate courts.

The only written evidence of any act performed in the case by either of the alcaldes or judges of the court of first instance, acting during the progress of the proceedings—the only courts having any jurisdiction in the matter—shown to have ever existed, is the taking and certifying by Judge Thomas of the oaths of Hensley and Reading to the appraisement, October 25, 1859, and marking that document filed October 27; and on the latter day marking filed the auctioneer's report of sale; and neither of these filing marks is attested by the signature of the officer. To sustain a forced sale of large landed estates of absent heirs under judicial proceedings so loosely conducted, and of which there does not appear to have been any record, or other written evidence, would be going beyond any authority or legal principle brought to the notice of the court; and further, I think, than any court having a due regard for the safety of private rights, would be justified in going. Besides, the heirs of John Potter presented themselves as claimants in the supplemental petition for the confirmation of the Mexican grant made to Farwell, and set out their title derived by the sale by Bidwell as the basis of their claim. Thus, in a proceeding to which they were parties seeking for themselves confirmation of the grant, their claim to the land, based upon this same title, was rejected, and the adverse claim of Farwell's heirs confirmed, and the lands patented to said heirs in accordance with the decree of confirmation. If Potter's heirs or their successors in interest should file a bill against the heirs of Farwell, as patentee, to charge them as trustees and seek a conveyance of the legal title, I apprehend that no court would grant the relief upon the evidence as presented in this case. If not, the same evidence and state of facts ought not to constitute a valid defense to the present bill.

2. The next question is, as to the validity of the sale of complainants' interest in the premises by Mighels as guardian, which is earnestly and confidently assailed on various grounds. The first ground is, that Mighels never was legally appointed guardian, the court never having acquired jurisdiction to appoint a guardian for want of notice. The act relating to guardians, in force at the time of the appointment of Mighels as guardian for complainants, so far as relates to this case, provided that the "probate judge of each county, when it shall appear to him necessary or convenient, may

appoint guardians to minors * * * who shall reside without the state and have any estate within the county." St. 1850, p. 268, § 1. Section 43 of the same act is as follows: "When any minor or other person liable to be put under guardianship, according to the provisions of this act, shall reside without the state, and shall have any estate therein, any friend of such person, or any one interested in the estate in expectancy or otherwise, may apply to the probate judge of any county in which there may be any estate of such absent person, and after notice given to all persons interested, in such manner as the judge shall order, and after a full hearing and examination, if it shall appear to him proper, he may appoint a guardian for such person." Id. 272.

Under this section the authority to appoint a guardian is "after notice is given to all persons interested, in such manner as the judge shall order." In this case, as in all actions where the rights of parties are to be affected by judicial proceedings, the fundamental condition of authority to act at all is to first acquire jurisdiction of the persons whose rights of property are to be affected, by giving them notice of the proceeding. Until the party to be affected has legal notice, the court has no jurisdiction whatever to act, and all proceedings without notice are without authority and absolutely void for want of jurisdiction. In Gronfier v. Puymirol, 19 Cal. 629, the question was as to the sufficiency, not the want, of the notice. There was notice given by publication in accordance with the order of the judge, and it was held that the time and manner of the notice, under the express provisions of the statute to that effect, were within the discretion of the judge; but it was not intimated that the judge could acquire jurisdiction without any notice. Besides, some importance seems to have been attached to the fact that the attack was made by third persons in a collateral way. and not by the minor. The court say "third persons cannot question the validity of the order upon any allegation that insufficient notice was given of the hearing of the application for the appointment under the statute." Id. 632. But in this case there does not appear to have been any notice whatever, and the record of what did take place seems in all respects to be very formal and complete. There is no recital of notice. The appointment was made two days after filing the petition. and only recites the filing of the petition as the basis of the appointment. But notice is essential to give jurisdiction, for the appointment is only to be made "after notice given to all persons interested." The person whose estate is to be divested by some one who voluntarily assumes to intermeddle, is. certainly. a "person interested," and under the statute is entitled to some notice, even though the kind and manner of it is left to the discretion of the judge. In the language of Mr. Justice Field, in Galpin v. Page [Case No. 5,-206],—a case where publication in a prescribed form was authorized: "Where personal serv-

ice cannot be made by reason of the non-residence in the state or absence of the infant, service must be made by publication, as in other cases. Such publication is the prescribed condition to the exercise of jurisdiction over the infant." So, in this case, "notice given to the persons interested"—the infants whose estates in many leagues of land are sought to be divested for the purpose of perfecting a contract of sale already made without legal authority, "in such manner as the judge shall order," "is the prescribed condition to the exercise of jurisdiction over the infant." This proceeding is in no sense in the nature of a proceeding in rem, like that in Grignon's Lessees v. Astor, 2 How. [43 U. S.] 319, and in that case letters of administration had been "duly granted and jurisdiction acquired." It is not sought in case of this guardian sale to apply property in the jurisdiction of the court to the payment of the debts of the infants for which it was liable. The whole object is, to divest the title of the infants by a stranger, on the pretense that it is for their benefit. There certainly should be notice of some sort, as the basis of jurisdiction, and this the statute requires.

Under the statute placing the proceedings of the probate courts upon the same footing as superior courts of general jurisdiction, and the decision of the supreme court of California in Hahn v. Kelly, 34 Cal. 391, conceding that I might have felt authorized to sustain the appointment of a guardian on the doctrine of presumptions recognized in that case, the supreme court of the United States in. Galpin v. Page, 18 Wall. [85 U. S.] 350, and Mr. Justice Field in the same case on retrial [Case No. 5,206], have overruled that case and distinctly held that, where the parties to be affected reside out of the jurisdiction of the court, the record must affirmatively show that every step necessary to give jurisdiction has been regularly taken, otherwise the proceedings are utterly void. That case was in all essential particulars in principle similar to this. The infant, a posthumous child of tender age, was a defendant in an action to settle an alleged partnership of her deceased father, one of whose heirs she was. An attempt to procure service by publication of summons upon her and her mother, with whom she lived in the state of New York, was made. Notice in some form actually reached the mother, with whom she resided, as she appeared and defended. The notice to the infant, in point of fact, was practically all that could be accomplished; for the same attorney who appeared for the mother, and, doubtless, at her suggestion and with her approval, was appointed guardian ad litem by the court, answered and defended the same as the mother. Besides, her interests and those of the mother were precisely the same, and not adverse. The same defense was actually made, and undoubtedly by the same guardian ad litem that it would have been made by had the publication been made in strict accordance with the provisions of the

statute. Yet the supreme court of the United States held that the appointment of guardian ad litem, without the record showing affirmatively that the service had been made in strict accordance with the provisions of the statute, was utterly void, and, consequently, that all subsequent proceedings were void. In the present case the proceedings were instituted by a stranger, upon advice of counsel of an adverse party, ostensibly, it is true, and it may perhaps have really been, in the interest of the infants, but for the express purpose of divesting their title to lands. They were entitled to notice 'so that an opportunity might be furnished to ascertain whether for their interest or not, and to oppose it if deemed expedient so to do. And the statute in this case, as in the other, imposes notice in some manner as a condition precedent to the appointment—as an essential prerequisite to the attaching of jurisdiction to act in the case. In my judgment it is impossible to distinguish this case from Galpin v. Page [supra]. If there is anything to the contrary in the prior decisions of the same court it must be regarded as overruled. This decision is of course conclusive upon this court. I feel bound, therefore, to hold the appointment of guardian to be void for want of the notice prescribed by the statute, and that the court never acquired jurisdiction to affect the rights of complainants in the proceedings had. The appointment of Mighel's guardian being void on the grounds indicated, and this appointment being the basis of the subsequent proceedings, authorities to show that all subsequent action must necessarily be void, do not seem to be required. Yet authorities on the exact point are not wanting. Frederick v. Pacquette, 19 Wis. 541. See, also, Galpin v. Page, before cited.

3. It is next claimed by defendants that if the guardian's sale is void in consequence of the defects in the proceeding, it is rendered valid by the provisions of the "Act in Relation to Probate Sales" of 1866. St. 1865–66, p. 824. Section 1 of said act is as follows: "In all cases where real estate has been sold in this state under the order of the probate courts of the several counties to purchasers in good faith, for a valuable consideration, and defects of form, or omissions, or errors exist in any of the proceedings, such sales are hereby ratified, confirmed, and made valid and sufficient in law to transfer the title to the property sold; provided, however, that this act shall not affect in any manner rights acquired prior to its passage, by vendees, grantees, or mortgagees, who claim interests in or liens upon such property under heirs or devisees adversely to such probate sales, nor to sanction in any manner cases of actual fraud."

There is something more in the probate proceedings under consideration than a defect of form or mere errors. There is a failure to acquire jurisdiction of the parties whose interests are to be affected—a failure of authority to act at all. This is, it is true, the result of an "omission" to give notice; but it is hardly to be supposed that the legislature contemplated such an omission. The term doubtless refers to omissions in the acts to be performed in the exercise of a jurisdiction, which has once attached, and not omissions of acts essential to give jurisdiction to act at all. If the act was intended to include the latter, then it must be void as to such matters. Before the passage of the act, the proceedings, as we have seen, were utterly void for want of jurisdiction. The rights of the complainants were as much unaffected by the proceedings as if they had never been taken. If then, they became valid by the passage of this act, the title has passed from the complainants to the defendants by virtue of the provisions of the act. That is to say, the legislature has arbitrarily transferred the property of the complainants to the defendants. I suppose it will not be seriously contended that the legislature, by passing a law declaring that' the property of A., by virtue thereof, shall be transferred to and vested in B., can transfer the property of one private party to another. That such an act would be unconstitutional, it seems to me, requires no argument to establish; yet such, substantially, would be the result if the act in question has the effect claimed.

There are other formidable objections to the validity of the proceedings upon which defendants rely, but it will be unnecessary to consider them, as those already decided dispose of the case.

There must be a decree for the complainants as to an undivided two-fifteenths of the premises in question, in pursuance of the prayer of the bill, with costs, and it is so ordered.