# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## APRIL TERM, 1869.

### GEORGE W. RYDER *v.* LOUIS COHN.

COURTS IN CALIFORNIA IN 1849.—The correctness of the proceedings of the Courts exercising civil jurisdiction in California between the time of its acquisition by the United States and the time when the code of laws enacted in 1850 went into effect are not to be tested by the strict rules of either the civil or common law.

IDEM.—The judgments of such Courts, and the titles acquired under them, are valid, notwithstanding they might be void if tested by the strict rules of the common law.

COURT OF FIRST INSTANCE.—The Court of First Instance was a *de facto* Court, exercising general and unlimited jurisdiction in civil cases and in matters of administration on the estates of deceased persons, prior to the enactment of a code of laws in this State in 1850.

JUDGMENTS OF COURT OF FIRST INSTANCE.—The judgments of the Court of First Instance, when offered in evidence in a collateral action, will not be held to be void for want of jurisdiction of parties, unless it appears affirmatively from the record that the Court did not acquire jurisdiction of the parties.

JURISDICTION OF COURTS OF FIRST INSTANCE IN PROBATE MATTERS.—The Courts of First Instance in California, between the time of its acquisition by the United States and the passage of a Probate Act in this State, had jurisdiction of matters pertaining to administration on the estates of deceased persons, and could make valid orders for the sale of the property of the deceased, for the payment of debts, etc.

IDEM.—The Court of First Instance will be deemed to have acquired jurisdiction over the parties, in matters relating to administration on the estates of deceased persons, unless the record of its judgment therein shows affirmatively that it had not such jurisdiction.

APPEAL from the District Court, Twelfth Judicial District,⁻ City and County of San Francisco.

Henry C. Johnson died intestate at the Pueblo of San Francisco, State of California, about the 26th day of December, 1849, leaving surviving him his wife, Elizabeth Johnson, then residing at said pueblo, his mother, Eliza Moss, and his brothers, F. A. Johnson, Samuel J., James W., Edgar M., and David J. Johnson, and his sister, Selina E. Abraham, wife of Abraham Abraham. The mother, brothers, and sister lived at Cincinnati, Ohio. The deceased left no children or father. At the time of his death deceased owned One Hundred Vara Lot Number One Hundred and Ninety-six in said pueblo.

This action was brought by Ryder, who was in possession of a part of said lot, to quiet the title as against Cohn, who, although out of possession, set up an adverse claim to the same.

On the 28th of December, 1849, said wife of deceased presented the following petition to John W. Geary, then Alcalde of said pueblo:

"SAN FRANCISCO, December 28th, 1849.
" *To his Honor, Judge Geary:*
"Sir: It is my wish that letters of administration upon the estate of my deceased husband, Henry D. Johnson, be granted by your Honor to Thomas H. Holt, of this city.
        "Very respectfully,      ELIZABETH JOHNSON."

On the twenty-eighth day of December, 1849, said Geary, as Alcalde aforesaid, made and signed an order appointing Thomas H. Holt administrator of the estate of said Henry D. Johnson, deceased; and on the twenty-ninth day of said December, 1849, said Geary, as Alcalde aforesaid, made, signed, sealed with his official seal, issued, and delivered to said Thomas H. Holt letters of administration upon the estate of Henry D. Johnson, deceased, in the words and figures following, to wit:

"ESTATE OF HENRY D. JOHNSON, DECEASED.

"*Probate Court.—Letters of Administration.*

"Whereas, It hath been made to appear that Henry D. Johnson recently died intestate, within this district; and whereas, Elizabeth Johnson, relict of the said deceased, hath petititioned this Court that letters of administration be granted unto Thomas H. Holt, of this district aforesaid; therefore, I, the undersigned, First Alcalde and Judge of Probate in and for the District of San Francisco, in consideration of the fitness and responsibility of the said Thomas H. Holt, do hereby grant unto the said Thomas H. Holt full power to administer the estate of the said Henry D. Johnson; to ask, collect, recover, and receive all the debts, dues, and demands, rights, credits, and interests belonging to or accruing to the said estate; to pay all lawful debts of the said estate, and to do all things pertaining to the duties of administration, according to the tenor of these presents.

"*Firstly.* Reporting to this Court, within one month from the date of these presents, inventories of every species of property belonging to the estate of the said Henry D. Johnson, deceased, (as far as known,) and, unless the property shall have been previously converted into money, appraisements of the same made under oath by persons appointed by this Court, who shall make return of their doings to this Court, or such other Courts as may be established within this district having jurisdiction in such cases, within *fifteen days* from the date of these presents.

"Given under my hand and official seal this twenty-ninth day of December, A. D. 1849.

"[L. S.]                          JOHN W. GEARY,
                    "First Alcalde and Judge of Probate.

"Attest:   JAMES O'GRADY, Register."

On the same day said Holt signed, sealed, and delivered a bond as such administrator to said Geary, as Alcalde aforesaid.

Appraisers were duly appointed, who, on the third day of January, 1850, returned to the said Alcalde an appraisal of the personal and real estate, the former being valued at two thousand eight hundred and ninety-six dollars, and the latter at five thousand one hundred and fifty dollars.

On the 11th day of January, A. D. 1850, said Holt, as administrator, petitioned said Geary, as Alcalde aforesaid, to make and issue an order to him, authorizing him to sell all the real estate of said Henry D. Johnson, deceased; said petition being in the words and figures following, to wit:

" *To the Hon. John W. Geary, First Alcalde of the City of San Francisco :*

" The petition of Thomas H. Holt, administrator of the estate and effects of Henry D. Johnson, deceased, respectfully showeth :

" That your memorialist requests your Honor to make and issue an order to him, authorizing him to set up and sell all the real estate of the said deceased, on giving one week's notice of such intended sale in one or more newspaper or newspapers published in San Francisco, on such terms as shall seem to him for the best interest of the estate.

" Dated this 9th day of January, 1850.

" THOS. H. HOLT."

On the 11th day of January, A. D. 1850, said Geary, as Alcalde aforesaid, made, signed, sealed with his official seal, and issued an order authorizing, empowering, and ordering said Thomas H. Holt, administrator as aforesaid, to " set up and sell all the real estate of the said deceased," Henry D. Johnson; said order being in the words and figures following, to wit:

"*By the Hon. John W. Geary, First Alcalde and Judge of Probate of the District of San Francisco :*

" It is hereby ordered that Thomas H. Holt, the administrator of the estate and effects of Henry D. Johnson,

deceased, do set up and sell all the real estate of the said deceased, by public auction, on such terms as shall seem to him for the best interest of the estate, on giving one week's notice of such intended sale in one or more newspaper or newspapers published in San Francisco, and that he execute the proper deeds to the purchaser or purchasers thereof at such sale.

"Given under my hand and official seal, this 11th day of January, 1850.

"[L. S.]                    JNO. W. GEARY,
                "First Alcalde and Probate Judge."

On the 25th day of January, A. D. 1850, said Thomas H. Holt, administrator aforesaid, petitioned the Hon. W. B. Almond, Judge of the First Instance of, in, and for said Pueblo and District of San Francisco, and then officially acting as such Judge of First Instance, by a petition in writing, said petition being in the words and figures following, to wit:

"*To the Hon. W. B. Almond, Judge of First Instance in and
    for the District of San Francisco:*

"The petition of Thomas H. Holt, of the City of San Francisco, in said district, respectfully shows:

"That he was lately appointed by the Hon. John W. Geary, First Alcalde of the said City of San Francisco, administrator of the property of Henry D. Johnson, lately deceased, in said city, and leaving property therein, a copy of which appointment is hereto annexed, marked 'A.'

"That afterwards, by an order of the said Hon. John W. Geary, Calhoun Benham and Charles A. Gurley, Esqs., were appointed appraisers of the property of the said deceased, and made an inventory and appraisement thereof, according to law; a copy of which said inventory and appraisement is hereto annexed, marked 'B.'

"That afterwards, on the 11th day of January, instant, on

CAL. REPS. XXXVII—10

the application of your petitioner, the said Hon. John W. Geary made an order empowering your petitioner to sell the real estate of the said deceased, at public auction, for the purpose of paying the debts of the said deceased; a copy of which said last mentioned order is hereto annexed, marked ' C.'

" But your petitioner shows unto your Honor that he is well advised that the said Alcalde has no jurisdiction in the premises, except, perhaps, to institute the preliminary proceedings in the same, but that the same properly belongs to the cognizance of your Honor, and that further proceedings cannot safely be had in the premises, under the said orders, without the confirmation of your Honor.

" Your petitioner therefore asks that the said appraisal and inventory may be filed in your Honorable Court, and that your Honor will thereupon take jurisdiction of the premises; that the appointment of your petitioner as such administrator, and the said orders made for his direction, may be confirmed, and your petitioner directed to proceed therein with the same effect as if the same had been originally made by your Honor.

" Your petitioner further asks that an order may be entered, requiring creditors and persons having claims against the estate of the said deceased to present the same to your petitioner, at some place in the City of San Francisco, within such time as shall be designated in such order, or that the claims therefor upon said estate be barred, and for the due publication of said order.

" And that your petitioner may have such further or such other relief as may be just and proper in the premises.

"DWINELLE & MARSHALL, Att'ys for Petitioner."

"*District of San Francisco*, ss.

" Thomas H. Holt, the said petitioner, being sworn, says that the preceding petition is true.          THOS. H. HOLT.

" Sworn before me, this 25th day of January, 1850.

"W. B. ALMOND, Judge."

Said petition, having annexed thereto, as a part of said petition, a copy of the said letters of administration in said estate, a copy of the said inventory and appraisement in said estate, a copy of the said petition for an order to sell real estate in said estate, and a copy of the said order for the sale of the real estate in said estate, was filed in said Court of First Instance the same day.

On the twenty-fifth day of January, A. D. 1850, said Almond, as Judge aforesaid, signed, made, and issued an order, in the words and figures following, to wit:

"*By the Hon. Wm. B. Almond, Judge of the First Instance in Civil Causes, in and for the District of San Francisco, and Judge of Probate in the same:*

"Whereas, Thomas H. Holt has filed his petition before the said Judge, setting forth that he was lately appointed by Hon. John W. Geary, First Alcalde of the City of San Francisco, administrator of the estate of Henry D. Johnson, deceased, and that the property of said deceased had been appraised, and an inventory thereof made on oath by appraisers appointed by the said Alcalde; and that the said Alcalde had afterwards made an order empowering the said petitioner to sell the real estate of the said deceased, at public auction, which said petition is verified by oath, and is accompanied with letters of administration granted by said Alcalde, and with a copy of said appraisal and inventory and of the order of sale.

"And whereas, the said Thomas H. Holt has submitted the said matters to the jurisdiction of the said Judge, to take jurisdiction of the said proceedings, and to continue the same with the same effect as if the same had been originally instituted before him.

"It is therefore ordered, that the said proceedings be in all things confirmed, and held of the same effect as if the same had been originally instituated before the said Judge of the First Instance; and that the said Thomas H. Holt be

appointed and continue administrator of thé said estate, and that he be empowered to sell the real estate at public auction, for the purpose of paying the debts of the said deceased, with the like powers as are prescribed in the said order of sale made in that behalf by the said Alcalde.

"And the said petition of the said Thomas H. Holt praying to that effect, it is ordered, that the said administrator cause a notice to be published, for at least one week, in a public newspaper published in the City of San Francisco, requiring all creditors and persons having claims against the estate of the said deceased to present them to the said administrator, in some place to be designated in said notice, within four weeks from the day of the first publication of the said notice, or they will be liable to lose the benefit thereof. And it is further ordered, that if such claims are not presented according to said notice, or before the final decree in this cause, the said claims may be barred by such final decree, and the administrator decreed to be discharged therefrom.

"And it is further ordered that the said administrator make his future reports, and apply for his future directions, to the said Judge of First Instance.

"Witness the hand and seal of the said Judge this the twenty-fifth day of January, A. D. 1850.

"W. B. ALMOND,

"Judge of First Instance, and Judge of Probate.

"Attest: T. S. POMEROY, Deputy Clerk."

Said order was filed in said Court.

On the seventh day of February, A. D. 1850, said Almond, as Judge aforesaid, ordered that the sale of the real estate of said deceased Henry D. Johnson, advertised to take place on that day, be adjourned to some convenient day, by public proclamation made at the place advertised for such sale on said day; and that, in the meantime, said administrator have such real estate surveyed and located, and charge the expense thereof to said estate.

On the fourteenth day of February, A. D. 1850, in pursuance of and in compliance with the order of said Geary, as Alcalde aforesaid, and the order of said Almond, as Judge aforesaid, and after notices of such intended sale in a newspaper published in said Pueblo and District of San Francisco, One Hundred Vara Lot Number One Hundred and Ninety-six was set up and sold by said Holt, as such administrator, at public auction, at the place specified in said notices, for cash, to wit: for the sum of three thousand one hundred and fifty dollars, to John W. Dwinelle, he being the highest bidder therefor.

On the fourteenth day of February, A. D. 1850, said Holt, as administrator aforesaid, delivered to said Almond, as Judge aforesaid, and filed in said Court of First Instance, a report of the said sale, and asking that it might be confirmed. The report was accompanied by an affidavit of the printer, showing the publication of notices of sale.

On the fourteenth day of February, A. D. 1850, said Almond, as Judge aforesaid, approved and confirmed said sales of said real estate.

On the fourteenth day of February, A. D. 1850, said John W. Dwinelle paid to said Holt, administrator as aforesaid, the sum of three thousand one hundred and fifty dollars in cash, as the purchase money of and for said One Hundred Vara Lot Number One Hundred and Ninety-six, and on the fifteenth day of February, A. D. 1850, said Holt, administrator as aforesaid, duly made, signed, sealed, and delivered to said John W. Dwinelle a due and regular deed of conveyance, in writing, conveying said One Hundred Vara Lot Number One Hundred and Ninety-six, and all the right, title, and interest of said Henry D. Johnson, deceased, of, in, and to said One Hundred Vara Lot Number One Hundred and Ninety-six to said John W. Dwinelle, which said deed was duly acknowledged and recorded.

In the matter of said estate of Henry D. Johnson, deceased, Edward Norton, Esq., appeared as and was attorney for the absent heirs.

A part of said purchase money of said One Hundred Vara lot Number One Hundred and Ninety-six was applied by said administrator to the payment of the debts of said Henry D. Johnson, deceased, and the balance of said purchase money was, in the month of March, A. D, 1850, paid by said administrator to the said mother, brothers, and sister of said Henry D. Johnson, deceased—said mother, brothers, and sister receiving said balance of said money, and consenting to said payment of said balance of said money.

Said mother, brothers, and sister of deceased were aware and knew of the proceedings before said Alcalde and said Judge of First Instance, and the acts of said administrator in said estate, and the said disposition and sale of said real estate and of said One Hundred Vara Lot Number One Hundred and Ninety-six, when they received the said money, and they acquiesced therein.

By due and regular mesne conveyances, in writing, all the right, title, and interest of said John W. Dwinelle of, in, and to the premises described in the complaint in this action, being a part of said One Hundred Vara Lot Number One Hundred and Ninety-six, has been duly conveyed to and was at the commencement of this action vested in the plaintiff, George W. Ryder.

By a due and regular deed of conveyance, in writing, said mother, brothers, and sister of said Henry D. Johnson, deceased, conveyed, on the eighth day of May, A. D. 1863, their then right, title, and interest of, in, and to said One Hundred Vara Lot Number One Hundred and Ninety-six to the defendant, Louis Cohn.

The Court below rendered judgment in favor of the plaintiff, and the defendant appealed.

The other facts are stated in the opinion of the Court.

*John B. Felton,* for Appellant.

Just a fortnight after Johnson dies—with a large amount of personal property on hand, without any debts proved or

advertised for, without any citation to any one interested in his estate—his whole property was ordered to be sold; and the heirs are to be divested of their estate simply because the administrator asks the privilege of selling it, and the Judge grants his request.

We contend, first, that the Alcalde had no jurisdiction over this estate; second, that the Court of First Instance had none; third, that if either of those Courts even did have jurisdiction over the subject matter of the estates of deceased persons, they had none in this case, because there was no citation or notice to the heirs or parties interested in this case, and because the petition of Holt and the orders of the Judges showed no reason for selling this property—no debt to be paid, nor expenses to be defrayed.

What we call in English an administration of a deceased person's estate is unknown to the civil law. Under that system, the heir immediately succeeded to the estate of the deceased—to all the rights and obligations. (See Domat's Civil Law, Vol. II, Sec. 2,470.) He was reputed heir from the moment of the death of the person to whom he succeeds. (See Domat, Vol. II, Sec. 2,477.)

As soon as the heir accepted the inheritance, he became the full owner of all the property belonging thereto, with all the rights of owner. This acceptance was of two kinds— the acceptance pure and simple, or the acceptance with benefit of inventory. By the acceptance pure and simple the heir became bound for the debts of the deceased, in the same way as if he had contracted them. By the acceptance with benefit of inventory, the heir is liable for the debts of the deceased to the extent of the property which belonged to the deceased. (See Domat, Vol. II, Secs. 2,690, 2,732.)

If the heir did not wish to accept the estate, he had the right to renounce it; but this renunciation could only be after he knew his rights, and the succession was fully open. (See Domat, Vol. II, Secs. 2,735, 2,737.)

How fully and immediately the heir had the right of disposing of the property of the deceased, without any legal

formalities, is shown by Section 2,710, Domat, Vol. II, which declares that if he who is called to an inheritance takes any of the goods belonging to it after it is open—as, if he reaps the fruits of any ground, if he cultivates it, if he farms it, if he takes any of the movables of the succession, if he sells them, or disposes otherwise of them, and, in general, if he takes that which he had no right to take but as heir, or if he disposes of any goods of the succession as master or owner—he makes himself thereby heir.

Taking, then, all this system together, it becomes simply this: when a man dies, his heir has the right to immediately take his place, has the immediate ownership and possession of the deceased's goods, and becomes personally responsible for his debts, either to the full extent, if the acceptance is unqualified, or to the extent of the value of the goods received, if the acceptance is with benefit of inventory.

Hence it follows that a Court has no more right to do what was done in this case—immediately to order the sale of a man's entire property—than it would have to take the property of a living man and summarily put it up at auction. These heirs were the owners of this property, and had themselves the right to sell it as much as if they had acquired it by purchase. It was their right and duty to pay these debts, and the Court could no more do it for them, than it could without suit pay any debts of their own contracting.

But even admitting that the Court of First Instance had jurisdiction over this subject matter, it never acquired jurisdiction over the persons of these heirs. It is conceded that Geary never had jurisdiction over either the subject matter or the persons. It follows, therefore, that the appointment of Holt, the inventory, and the order of sale were void.

*Davis Louderback*, for Respondent.

In order to properly adjudicate the question involved in this appeal, it will be necessary for the Court to take into consideration the condition of California previous to the

organization of the State Government and the legislative adoption of the common law. Under Mexican rule California was a Territory. It was sparsely populated; here and there a rancho; no ready or easy means of intercommunication with the Mexican Capital or National Government. The written laws of Mexico, though theoretically in force, were either unknown, or had fallen into disuse, or were annulled and supplanted by provincial customs. The law and its forms and administration were different in different districts. The people who were here were ignorant, and destitute of learned lawyers and Judges. Under American rule, the discovery of gold induced an immigration ten times as large as the original population of California, and numerous enough to form a State. Under such circumstances, what could the Americans do? The Mexican laws were written in a different language, and founded on a different system of jurisprudence, with the principles of which they were unacquainted. The flood of American population swept away the ancient landmarks. The American settlers could obtain no books containing Mexican laws. They found no established laws, no established institutions, and no Judges to administer the law. The necessities of trade and commerce, the urgency of their condition, and self protection, justice, and humanity, demanded some law to regulate their transactions and intercourse, and some Judge to dispense justice. They were compelled to adopt customs for their government. They established the system of Alcaldes and Judges of First Instance. They appointed or elected as Alcaldes and Judges those whom they believed to be the best qualified to fulfill the onerous and responsible duties of the offices. The judicial proceedings were conducted in the English language. The Judges administered justice without regard to forms and technicalities, and with very little regard, if any, to Mexican laws. "Custom was for all purposes law." (*Fowler* v. *Smith*, 2 Cal. 49.) All judicial proceedings were summary. Time was money. A month then

was equal to a year at the present time. The greater portion of the population was transitory. The Courts were compelled to afford to litigants and petitioners immediate relief and satisfaction. Not only was speedy justice more desirable than exact justice, but the slightest delay was absolute injustice. (1 Cal. 578.)

Under Mexican and American rule, the Courts administered justice, not according to the rules of the Mexican law, or the principles of the common law, but according to their own notions of right, justice, equity, and public policy. (Ex. Doc. No. 17, House of Reps., XXXIst Congress, First Session, 734; Tuthill's History of California, 215, 216; Bryant's California, 444; 1 Cal., Appendix, 578.).

The Judges, being ignorant of the laws, were compelled to apply to the Governor of California for instructions, and he, being equally ignorant, could only say, "You must, for the time being, be governed by the customs and laws of the country, as far as you can ascertain them, and by your own good sense and sound discretion." (Ex. Doc. No. 17, House of Reps., XXXIst Cong., 317.)

The condition and government of California were anomalous and unprecedented in the history of the world. Its government was of a patriarchal character. The Supreme Court of the United States has characterized it as "chaotic." (*Adams* v. *Norris*, 23 How. 362.) The Governor exercised all kinds of powers—executive, legislative, and judicial. The highest United States army officer in California was *ex officio* its civil Governor. He appointed the Secretary and Treasurer of the Territory, (Ex. Doc. No. 17, House of Reps.; XXXIst Cong., First Sess., 377, 796;) established a Superior or Supreme Court, and appointed Supreme Judges, (Ib 826, 853, 854, 870, 808, 820, 821, 827;) Judges of First Instance, (Ib. 806, etc.;) Judge of Court of Admiralty, (Ib. 291, 292;) Alcaldes, (Ib. 287, 295, 306, 316, etc.;) Attorney General and Prosecuting Attorneys, (Ib. 807, 395;) Prefects, (Ib. 807, etc.;) Sheriffs, (Ib. 322;) Notaries Public, (Ib. 756, 757, 853, etc.;) Collectors of Customs, Harbor Masters, Port Wardens, Sur-

veyors, Indian Agents, etc., (Ib. 379, 654, 655, 660, 784, 295, 296, 377, etc.;) suspended or removed officers, and. filled vacancies, (Ib. 474, 458, 759, 564;) instituted special tribunals to try special cases, such as murder, counterfeiting, kidnapping, etc., (Ib. 384, 395, 414, 505, 539, 407, 570, 571;) revived or established municipal governments, authorized, confirmed, or set aside elections, (Ib. 774, 775, 778, 498, 593, 595, 690, 700, 703, 759, 774, 660, 661, 432, 451;) granted to foreign bottoms the privileges of American vessels, (Ib. 663, 693, 412, 442;) decided under what circumstances vessels were to pay tonnage and revenue, (Ib. 436;) abolished Mexican laws and customs (Ib. 476, 477) as to "denouncement" of mines; established custom house, port, and police regulations, (Ib. 584–586;) promulgated prohibitory laws, and attached a penalty to their violation, and determined the Court that should try the offenders, (Ib. 584–586, 437;) prescribed the mode and place of trial, the manner of summoning and empanneling a jury, (Ib. 505, 506;) what cases must be tried by a jury, (Ib. 452;) the fees of Judges, Sheriffs, Clerks, jurors, witnesses, etc., (Ib. 541, 419, 420;) and gave binding instructions to the Judges, (Ib. 563, 564, 488, 559, 317, 447.) The Courts were allowed by the Governor to appoint Sheriffs, Constables, Clerks, etc., (Ib. 852, 487.) The Alcaldes were, "by necessity, tacitly permitted to obtain and exercise a most extensive and unlimited jurisdiction," (Ib. 733,) and recognized as being "*ex officio Jueces de primera instancia*," (Ib. 763,) and in the exercise of their criminal jurisdiction, they even tried men for manslaughter. and murder, etc., (Ib. 410, 404, 487, 488, 653.) The Court of First Instance was a Court of general jurisdiction, and both that Court and the Alcalde administered upon the estates of persons dying intestate, and ordered the sale of their land when the interests of the succession or justice required it. Such public wants were in no otherwise provided for by those in authority, and the exercise of such powers were universally acquiesced in, and regarded and held as valid and binding. Up to the organization of the Supreme or Superior Court of

the Territory, the Governor exercised the powers of an appellate Court. He changed the venue, stayed proceedings, suspended sentences and judgments, and reversed decisions. (Ib. 564, 770, 376, 395, 391, 563, 733, 734.)

In Louisiana, during the existence of the Spanish law, the Governor likewise exercised anomalous powers, and was not only the chief executive, but the highest judicial officer and authority in the Territory. (*Charleville* v. *Chouteau*, 18 Mo. 505.) Under the Mexican rule in California, "the Governor in person was the appellate Court." (1 Cal. 574.) This anomalous government *de facto*, with the exercise of these anomalous powers, was the Government of California while a Territory, and was authorized and recognized by the authorities of the United States, and validated by the acquiescence and presumed consent of Congress and the people of California. The Alcalde and Judge of First Instance had jurisdiction and were authorized to order the sale by the custom and usage of the pueblo and district, and such custom and usage may be proven by the parol testimony of witnesses. American custom may abrogate Mexican law. It abolished usury. In fact, custom was then law. (*Fowler* v. *Smith*, 2 Cal. 47.) American custom may not only control, limit, modify, and annul Mexican laws, written or unwritten, but may establish law in direct and positive contravention of the written laws, statutes, and constitutions of Spain and Mexico. By the Mexican law and Mexican Constitution of 1836, conciliation was absolutely necessary in order to confer jurisdiction; yet, as Americans had regarded conciliation as useless and unnecessary, the Court held that American custom supplanted the positive written law and Constitution of Mexico, and the Court took judicial notice of the custom. (*Von Schmidt* v. *Huntington*, 1 Cal. 64; Escriche, Derecho Español, 23, 24; Escriche, Dic., tit. "Costumbre;" 1 Feb. Mej. 55–61.) "Custom and usage, when once settled, are equivalent to law, though they may be comparatively of recent date." Such custom and usage may be proven by witnesses. (*Reynolds* v. *West*, 1 Cal. 326; *Payne* v. *Treadwell*, 16 Cal. 227.) "It was

a maxim of the Roman law, *communis error facit jus;* and this maxim has been adopted in the Spanish law to its full extent. (*Panaud* v. *Jones,* 1 Cal. 498; see, also, as to custom and proof by witnesses, *Poster* v. *Rassette,* 3 Cal. 468, 469; *Castro* v. *Castro,* 6 Cal. 160; *Tevis* v. *Pitcher,* 10 Cal. 477, 478; *Gregory* v. *McPherson,* 13 Cal. 573; *Adams* v. *Norris,* 23 How. 353.)

Besides, the practice of the Courts to administer upon the estates of intestates was authorized and approved by the Governor—the supreme executive, legislative, and judicial authority of California. (Ex. Doc. No. 17, XXXIst Cong., First Sess., 555, 676, Governor's Instructions to Alcaldes John Townsend and T. M. Leavenworth, of San Francisco.) The judicial acts of a person that exercises a jurisdiction which does not legally belong to him, but which is generally recognized and submitted to by the people are valid, and binding. (Don Manuel de la Peña y Peña's Practica Forense Mejicana, Vol. II, pp. 78–80.)

By the Court, CROCKETT, J.:

The two principal questions presented by this appeal are, first, whether the title of the plaintiff, founded on the sale by the administrator of the real estate of Henry D. Johnson, deceased, is valid, or whether the alleged administration and all the proceedings thereunder are absolutely void; second, whether, conceding the administrator's sale to have been void, the heirs at law have ratified it by accepting a part of the purchase money for which it sold.

The administration proceedings were commenced before the Alcalde in 1849, and were transferred to and completed before the Court of First Instance early in 1850. The validity of these proceedings is attacked on the ground, first, that neither the Alcalde nor the Court of First Instance had any jurisdiction in matters of probate; second, that if these Courts had any lawful jurisdiction in such cases, neither of

them acquired any jurisdiction in this case, either of the subject matter of the estate or of the persons of the heirs at law, because the petition for the letters failed to disclose the necessary jurisdictional facts, and no notice of the application, either for the letters of administration or the order of sale, was given or attempted to be given, in any form, to the heirs at law.

If the validity of these proceedings were to be tested by our present Probate Act, they would be held to be void, without hesitation, on both the grounds stated. But they must be tested by a wholly different standard. The state of affairs which existed in California in 1849 and in the early part of 1850 is without a precedent in the history of civilization. We had just acquired the country by the treaty of Guadalupe Hidalgo; and the discovery of gold in such profusion had caused a sudden and vast influx of population from all parts of the world. California immediately acquired immense importance in the eyes of all civilized nations; and it was anticipated that she would speedily be admitted as a State into the American Union, and would enact her own laws. In view of this contingency, Congress failed to provide for organizing it into a Territory, with suitable laws for its government; and in September, 1850, it was admitted as a State into the Union, under a Constitution previously ratified by the people. Prior to this event, however, the first Legislature, under the Constitution, had assembled in 1850 and passed a code of laws for our government, which went immediately into operation. But from the time of the cession up to the period when these laws took effect, we were practically without legislation and without any well defined system of law. And yet the public exigency was such, that in order to avoid a state of the most dire confusion, and to escape a condition of complete anarchy, it was indispensable to the preservation of order and the protection of life, liberty, and property, that tribunals should be established by the consent, or at least with the acquiescence of the people, for the administration of justice in some form. It is a well

known principle that upon a conquest or cession of foreign territory the laws of the former sovereign will prevail until they are abolished or supplanted by others enacted by the new sovereign. Acting on this familiar legal proposition, the people and the military authorities then in charge here attempted to carry it into execution; but their efforts in that direction were necessarily crude and imperfect, both on account of their ignorance of the laws and the forms of procedure which had theretofore prevailed, and because, also, of the inherent difficulty of originating and putting into operation the different tribunals which were necessary for the administration of justice in some form. In the absense of some legitimate head of the proposed *de facto* Government, the military officer then in charge of this department of the public service assumed to act as such, in order to put into operation the crude legal machinery which the exigency demanded. Hence we find that the Commanding General appointed Judges, Alcaldes, Prefects, Sheriffs, and Notaries; superseded or removed them; regulated municipal government; authorized and vacated elections; promulgated regulations which had the force of law; and fixed the fees of public officers. This exercise of authority was acquiesced in by the people, as their only refuge from disorder and anarchy; and the judgments of the Courts thus established were respected for the same reason. By the judgments of these Courts criminals were punished; property was attached and sold; large sums of money were collected under execution; numerous vessels were libeled; real estate, now of immense value, was sold at forced sale to innocent purchasers in good faith, and the estates of deceased persons were managed, administered upon, and settled. The functionaries who thus administered justice, after a crude fashion, made little or no pretension to any knowledge of the Mexican or civil law, and did not attempt to follow the forms of procedure which that law prescribed. On the contrary, they generally adopted the common law forms; and their records exhibit a clumsy effort to administer what little

they knew of the civil law, by means of common law proceedings. If tested by the rigid and inflexible rules of the common law, or by any strict interpretation of the civil law, it is questionable whether any judgment ever rendered by these Courts could stand. To say nothing of the tenure by which they held their offices, their proceedings were of so summary a character, and often so repugnant to the well established principles which regulate the administration of justice in other countries, as almost to excite our special wonder, at this day, after the lapse of twenty years. We are, therefore, in this class of cases, reduced to one of two alternatives, to wit: we must either treat the judgments and proceedings of these Courts, however informal, as valid and operative, under the anomalous condition of affairs which then existed, or we must subject them to the rigid tests by which the validity of judicial proceedings is determined in other and older communities. When examined in the light of the latter rule, it is probable but few, if any, judgments ever rendered by the Court of First Instance would stand the test of judicial scrutiny. Nearly every forced sale of real estate made under its process would be liable to be set aside as rendered on a void judgment; almost every man convicted and punished by it for crime would be entitled to his action for damages; and many innocent persons might be compelled to surrender their estates, acquired on the faith of judicial proceedings which transpired twenty years ago, and which, at the time, were universally recognized as valid proceedings of the only Courts which existed in the country.

We deem it to be our duty to adopt the former alternative, and to hold the judgments of these Courts, and the titles acquired under them, to be valid, notwithstanding they might be void if tested by the strict rules of the common law. They do not purport to be proceedings at common law, and their validity cannot, therefore, be tested by the principles applicable to that system; nor are they, in any strict sense, proceedings under the civil law, but a sort of judicial anomaly, having some of the features of each, without the distinctive

character of either.   Nevertheless, the judgment of the
Court of First Instance was the judgment of a *de facto* Court,
exercising general and unlimited jurisdiction in civil cases
and in matters of administration on the estates of deceased
persons.   It was the only Court then in existence in Califor-
nia exercising these functions, and its authority was univer-
sally acquiesced in and respected by the people.   Being a
Court of general jurisdiction, its judgments, even if tested
by the common law rule, would be upheld, unless it appeared
affirmatively from the record that it had not acquired juris-
diction of the parties in interest.   (*Hahn* v. *Kelly*, 34 Cal.
391.)

It does not appear affirmatively from the record in this
case that the Court had not acquired jurisdiction of the par-
ties in interest.   For aught that appears *in the record*, the
heirs at law may have had due notice of the proceedings;
and in *Hahn* v. *Kelly* we held that in this respect the record
cannot be impeached in a collateral action by proof *aliunde*.
But the appellant claims that it appears from the record that
the Court had not and could not have acquired jurisdiction
of the subject matter of the proceeding, because, he urges,
it has been settled by prior adjudications of this Court that,
under the Mexican system, there could be no grant of letters
of administration on the estate of a deceased person—that
such a proceeding was unknown to the Mexican law.   The
decisions relied upon to sustain this position are: *Grimes* v.
*Norris*, 6 Cal. 624; *Tevis* v. *Pitcher*, 10 Cal. 465; *De la Guerra*
v. *Packard*, 17 Cal. 193; *Soto* v. *Kroder*, 19 Cal. 97; *Downer*
v. *Smith*, 24 Cal. 114; *People* v. *Senter*, 28 Cal. 502; *Wilson*
v. *Castro*, 31 Cal. 420; *Coppinger* v. *Rice*, 33 Cal. 408.

In all these cases, except *People* v. *Senter*, the propo-
sition decided was, that in case a testator or intestate died
in California prior to the passage of our Probate Act, the
will could not be probated, nor letters of administration
granted, under that Act, which was intended to be prospect-
ive only in its operation.   In *People* v. *Senter* the decision

was, that where an intestate died after the passage of the Probate Act of 1850, and before it was repealed by the Probate Act of 1851, letters of administration on the estate might be taken out under the last named Act. But in *Coppinger* v. *Rice* we say: "These cases must now be regarded as establishing beyond further controversy the proposition that on the death of an intestate, under the Mexican system, the heirs succeeded immediately to the estate and became personally responsible for the debts of the deceased, irrespective of the question whether the heirs were adult or minor, and that no administration, in the sense of the common law, was needed or could be had at any time."

The latter branch of the proposition was not involved in the decision of the case, and is, therefore, at most but a *dictum.* But while it may be true that under the Mexican system there was no such proceeding as an administration, "in the sense of the common law," yet it would be a most strange anomaly in any system of law, if there was not some analagous proceeding for preserving and distributing the estate of a deceased person for the benefit and security of the creditors and heirs at law, in any case whatever. Without attempting the difficult and useless task of analyzing with precision what these regulations were under the Mexican system, we are satisfied there was some proceeding provided by law, or by usage and custom having the force of law, whereby the estate of a deceased person could be preserved, and, if need be, in proper cases, disposed of for the payment of debts. Otherwise, it might happen that there would be no heir at law or other party in interest present to take charge of and preserve the estate; in which event, it would be liable to spoliation or ultimate destruction or loss. It appears the Court of First Instance attempted to carry out these regulations or usages, whatever they may have been, and hence we find it exercising jurisdiction over the estates of deceased persons, with the consent and acquiescence of the people, its decrees submitted to, and its authority unquestioned. Its proceedings, as shown in this case, were

crude and summary, and wanting in some of the chief elements which characterize judicial proceedings in older communities. But, crude as they were, the titles to property, now worth, perhaps, many millions of dollars, are founded upon them; and none but the most imperative rules of law would justify us in holding, after the lapse of twenty years, that these proceedings were all void for want of jurisdiction in the Court, and thus annulling the numerous titles held under them. On the contrary, we think the proceedings of these Courts have been so long acquiesced in, and such important interests have grown out of them, that they should be held at this late day to have become a rule of property, without inquiring very minutely into their original validity. We therefore hold the title of the plaintiff, founded on the administration proceedings, to be valid. This view of the case renders it unnecessary for us to discuss the question of ratification by the heirs.

Judgment affirmed.

RHODES, J., dissenting:

It is the settled doctrine of this Court that upon the death of a person in California before the passage of the Probate Act of April 22d, 1850, his estate immediately vested in his heirs or devisees, and they became personally responsible for his debts. (*Grimes* v. *Norris*, 6 Cal. 624; *Tevis* v. *Pitcher*, 10 Cal. 465; *De la Guerra* v. *Packard*, 17 Cal. 193; *Soto* v. *Kroder*, 19 Cal. 97; *Downer* v. *Smith*, 24 Cal. 114; *People* v. *Senter*, 28 Cal. 502; *Wilson* v. *Castro*, 31 Cal. 420; *Coppinger* v. *Rice*, 33 Cal. 408.) In the last mentioned case we say: " We agree with counsel for respondent that it is too late to disturb the rule which was announced in *Grimes* v. *Norris*, 6 Cal. 624; " and after reviewing several of the cases above cited, it is added: " These cases must now be regarded as establishing, beyond further controversy, the proposition that, on the death of an intestate, under the Mexican sys-

tem, 'the heirs succeed immediately to the estate, and become personally responsible for the debts of the deceased,' irrespective of the question whether the heirs were adult or minor, and that no administration, in the sense of the common law, was needed or could be had at any time. It may be that the distinction for which the counsel for appellant so learnedly contends should have been made, but it was not, and it is now too late to draw it. It is impossible to estimate the mischief which might result from a departure from a rule which for so long a time has been regarded by both the bench and the bar as finally settled." This doctrine is decisive of this case, but there are other points that are also fatal to the claim of title derived from the probate proceedings.

The Court found as a fact that the Alcalde exercised the power of administering upon the estates of persons dying intestate in the pueblo and district of San Francisco, and of alienating their real estate; that the Judge of First Instance exercised the powers of a Court of general jurisdiction in all matters of law, equity, admiralty, and successions, and in all civil cases and matters of whatsoever nature, and exercised the powers of administering upon the estates of persons dying intestate in said pueblo and district, and of alienating their real estate; and that the people of said pueblo and district submitted to and acquiesced in, and sustained the Alcalde and Judge of First Instance in the exercise of those powers, and regarded their acts as valid and binding in such matters.

I acknowledge the full force of the reasons and suggestions advanced in *Fowler* v. *Smith*, 2 Cal. 39; *Grignon's Lessee* v. *Astor*, 2 How. U. S. 319; *McNair* v. *Hunt*, 5 Mo. 301, and other cases cited by the respondent in support of proceedings had under circumstances somewhat similar to those surrounding this case. The officers under whom these proceedings were had, and most of the people of San Francisco, were Americans, more or less conversant with the rules of the common law, but almost entirely ignorant of the civil law and of the changes and modifications effected by either

the Spanish or Mexican law. It was understood that the laws in force before the change in flags still continued in force, but they had no access to those laws. The names of the Courts and officers were continued or revived, but there was no one who could define their power or duties. In the throng and rush of business numerous controversies arose, and the necessity for Courts for their decision was imperative. Under such circumstances every reasonable presumption should be extended to sustain their proceedings. It is unnecessary to notice the numerous citations of the plaintiff's counsel from the books of the Spanish and Mexican law, to sustain the jurisdiction exercised by those Courts, for they were not organized under and were not guided by those laws. I shall not attempt, in this case, to ascertain the limits of the jurisdiction of those Courts; and the necessity of undertaking the inquiry is becoming less every year, and it may reasonably be anticipated that the question will soon become of no practical importance. I shall assume that each of those Courts had jurisdiction of the estates of intestates. But in view of the propositions first laid down—that an estate vested in the heirs of the intestate, they taking the estate by the same title by which the intestate held it, but subject, of course, to the payment of his debts—the Court had no authority to proceed *de officio* and take charge of the estate, as if the title vested in the Court for the purpose of administration. Nor would the administration amount to a proceeding *in rem*, for the Court did not have or take possession of the estate. The principal purpose of the administration was to cause the debts of the intestate to be paid, by enforcing the lien or charge upon the estate for their payment. The administrator did not acquire the title to the estate, but it remained in the heirs until it passed to the purchaser at the sale ordered and made for the payment of the debts. He did not represent the land in any sense, but only sold and conveyed it in obedience to the order of the Court, and until it was sold and conveyed the heirs held possession of and represented the real estate as fully in all respects as

if they had acquired it by purchase instead of descent. Their title, therefore, could be divested only by proceedings to which they were parties, and the probate proceedings were rather proceedings *inter partes* than *in rem.*

Neither of those Courts could acquire jurisdiction of the estate except upon the representation, in some form of pleading, of the existence of the jurisdictional facts—facts showing that judicial action was necessary. A petition for letters of administration was filed with the Alcalde on the 28th of December, 1849; and on the same day the Alcalde ordered that letters of administration issue, and on the following day they were issued. On the 11th day of January, 1850, the administrator filed a petition requesting the Alcalde "to make and issue an order to him, authorizing him to set up and sell all the real estate of the said deceased;" and on the same day the Alcalde made an order directing the administrator to "set up and sell all the real estate of the said deceased," and to execute proper deeds therefor to the purchasers; but neither in the petition nor the order were any grounds or reasons stated for the sale. The administrator filed a petition in the Court of First Instance, on the 25th of January, 1850, reciting his appointment, the petition and the order for the sale of the real estate, and praying the Court "to take jurisdiction of the premises," to confirm his appointment as administrator, and the order of sale, and to direct him to proceed with the sale with the same effect as if the order had been made by that Court; and on the same day the Court made an order confirming the proceedings stated in the petition, and ordered that the petitioner "be appointed and continue administrator of the said estate, and that he be empowered to sell the real estate at public auction, for the purpose of paying the debts of said deceased, with like powers as are prescribed in said order of sale made in that behalf by the said Alcalde;" and that the administrator publish a notice requiring the claims against said estate to be presented to the administrator within four weeks after the first publication of the notice. The administrator sold

and conveyed the lot of which the premises in controversy form a part on the 14th of February, 1850, and on the next day he conveyed the same to the purchaser.

Passing by the questions of the sufficiency of the petition to give the Alcalde jurisdiction to issue the letters of administration, and of the necessity of giving notice, either actual or constructive, to the heirs of the intestate, of the application for letters of administration, and as to whether the petition filed in the Court of First Instance stated facts sufficient to authorize the Court to order that the petitioner "be appointed and continue administrator of said estate," I will notice the question of the authority of either of those Courts to make the order for the sale of the real estate.

An allegation in the petition or application upon which the order of sale is sought, that the intestate, at the time of his death, owed debts, is indispensable, and without it the Court has no authority to proceed to order the sale of the property of the estate. The existence of debts is a jurisdictional fact, and must be averred in order to show the necessity of a sale. The fact of the death of the intestate, and that he left property within the territorial jurisdiction of the Court, are not more clearly jurisdictional facts than is the fact that he was indebted at the time of his death. In this respect the rule would be the same were probate proceedings held to be proceedings *in rem*, for evidently the Court could neither take possession of the estate, nor order its sale, in the absence of any necessity for such action. The absence of any allegation in either petition, that the intestate, at the time of his death, owed any debt, is fatal to the orders of sale.

There is a further objection to those orders, which, in my opinion, is insuperable.

The heirs were not notified of the proceedings. They resided in the State of Ohio, and the brief time elapsing between the filing of the petitions and the making of the order of sale rendered it impossible for them to have been either actually or constructively notified of the pendency of

the proceedings. The title was in them, and they could not be divested of it by proceedings of which they had no notice. If it is considered, as is sometimes done, that the several steps in the matter of the estate, commencing with the application for letters, constitute only one proceeding, the difficulty is not avoided, because there was no notice to the heirs of the petition to the Alcalde for letters of administration, or the petition to the Judge of First Instance for confirmation of the appointment by the Alcalde. If the title to the estate vested in the heirs, the necessity of notice to them of the pendency of the proceedings, before the order of sale was made, is too apparent to admit of argument.

The judgment, in my opinion, should be reversed, and the cause remanded for a new trial.